80 A.3d 380

**COMMONWEALTH of Pennsylvania, Appellee**

**v.**

**Michael Eric BALLARD, Appellant.**

Supreme Court of Pennsylvania.

Submitted Feb. 26, 2013.

Decided Nov. 21, 2013.

180

Michael F. Corriere, Esq., Bethlehem, Office of the Public Defender, for Michael Eric Ballard.

Amy Zapp, Esq., Harrisburg, PA Office of Attorney General, John Michael Morganelli, Esq., for Commonwealth of Pennsylvania.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.

### *OPINION*

Chief Justice CASTILLE.

We review the direct appeal of Michael Eric Ballard ("appellant") from four sentences of death imposed on May 17, 2011, following appellant's plea of guilty to four counts of first-degree murder and the subsequent jury trial to determine his sentence, which was held before the Honorable Edward G. Smith of the Northampton County Court of Common Pleas. Appellant raises claims of trial court error regarding aspects of his penalty phase hearing, a constitutional challenge to the admissibility of victim impact testimony, and challenges to the jury's weighing of statutory aggravating and mitigating circumstances. For the reasons that follow, we affirm the conviction and judgment of sentence.

## Case History[1]

In 1992, appellant pled guilty to an unrelated third-degree murder and was sentenced to a minimum of fifteen years in prison. Appellant was released on parole in 2007 and met Denise Merhi, an assistant in the medical office in which he was receiving a physical examination for employment. The two began dating and briefly lived together at Merhi's residence in Northampton Borough, Pennsylvania. Merhi lived with her father, Dennis Marsh, her grandfather, Alvin Marsh, and her daughter and son (roughly 8 and 12 years old, respectively). Appellant was re-incarcerated for violating his parole and released again in April 2010. As a term of his release, appellant was required to live at the Allentown Community Corrections Center. He and Merhi resumed their relationship, though appellant came to believe that Merhi was dating other men.

On June 23, 2010, Merhi and her friend, Debbie Hawkey, took Merhi's daughter and Hawkey's two young children to Seaside Heights, New Jersey, to celebrate Merhi's daughter's birthday. During their time away, appellant repeatedly called Merhi's cell phone, but she ignored his calls. The group returned from the beach on June 25, 2010, and Hawkey lent Merhi her van because Merhi's car was under repair. That evening appellant was still not receiving any response from Merhi. Appellant then phoned Merhi's friend, Marilyn Rivera, to inquire as to Merhi's whereabouts. Appellant appeared agitated, and asked Rivera if Merhi was romantically involved with other men. Rivera told appellant that Merhi was seeing another man named Peter Hoff. Appellant became upset and told Rivera that he loved Merhi so much that he could not let her go, that he felt anger like he had never felt before, and that he "did not know how to handle it." N.T., 5/10/11, at 112.

The next morning, June 26, 2010, appellant again made several attempts to call Merhi from the correction center

1. For purposes of this narrative, we have looked to the guilty plea proceeding and the penalty hearing, cited as Notes of Guilty Plea (N.P.) and Notes of Testimony (N.T.), respectively.

payphones. Just before noon, appellant left the center wearing a light blue shirt with a Superman emblem on the front and carrying a green canvas knapsack and a radio. Appellant visited two different pawn shops and unsuccessfully attempted to trade in his radio for credit toward the purchase of a knife. At the second location, appellant purchased a Muela Ruko knife. Appellant caught a city bus to Northampton Borough and, once there, entered a bar and ordered a drink. About twenty minutes later, neighbors observed appellant walk slowly up an alley near Merhi's residence and peer around the corner of a garage in order to view Merhi's home. Appellant proceeded to a liquor store, purchased a bottle of vodka, and called Merhi's cell phone twice from a gas station payphone. During the phone calls, appellant confronted Merhi about Peter Hoff, and Merhi responded that Hoff was merely a friend.

At approximately 4:45 p.m., Hawkey arrived at Merhi's house to retrieve her van. Failing to find her keys in Merhi's mailbox, Hawkey entered the front door of the home, which was unlocked. Hawkey found her keys on the dining room table and laid her purse down. She could hear noises from the kitchen, and when Hawkey entered the kitchen to see if anyone was home, she found Merhi lying on the floor in a pool of blood and heard rustling noises coming from the rear of the house. Hawkey ran from the house and to the porch of Merhi's nearby neighbors, Steven and Janet Zernhelt. After Hawkey told them what she had seen, Mr. Zernhelt ran into Merhi's house while Hawkey and Janet called 911.

At the same time, another neighbor saw appellant exit onto Merhi's front porch shirtless and covered in blood.[2] Appellant left Merhi's residence in Merhi's Pontiac Grand Prix before the police arrived. Shortly thereafter, appellant crashed the car into several trees off the side of a nearby highway. Corporal Mark Rowlands of the Pennsylvania State Police observed the crash and approached the vehicle. Cpl. Rowlands noticed that appellant was unconscious and covered in

---

2. The neighbor, a 13 year old girl, knew appellant as Merhi's boyfriend, Michael. N.T., 5/9/11, at 229.

blood. As appellant began to regain consciousness, Cpl. Rowlands asked appellant for his name and where he was coming from. Appellant replied, "I just killed everyone." N.T., 5/9/11, at 175. Cpl. Rowlands, who at the time had no knowledge of the homicides that had occurred in Northampton Borough, asked appellant what he meant, and appellant responded, "Isn't it obvious I just killed everyone." *Id.* at 176.

Eventually, Emergency Medical Services workers arrived at the scene of the accident and transported appellant to the hospital for treatment of his injuries.[3] At the hospital, appellant made several statements to hospital personnel that he had killed his girlfriend, "her family, and the neighbor who came over later." *Id.* at 247. As police were photographing appellant's injuries, appellant also stated, "Give me the papers. I'll sign them. Make your report. I shouldn't have lived through this. I'll plead guilty. Blame the parole board." *Id.* at 246.[4]

In response to the 911 call, State Trooper Raymond Judge and Coroner Zachary Lysek entered Merhi's residence and found the bodies of Mr. Zernhelt, Merhi, and Merhi's grandfather, Alvin Marsh. Merhi's body was located on the floor in the kitchen; Zernhelt was found on the floor of the living room; and Alvin Marsh, who was deaf and partially blind, was found in his wheelchair in front of the television in his bedroom. Each area was "heavily saturated with blood," and there were signs of an "extensive struggle." *Id.* at 73. Each victim had suffered from "multiple sharp force injuries." N.P., 4/20/11, at 19–20. Trooper Judge and Coroner Lysek later re-entered the home after becoming concerned that Merhi's children might be somewhere in the house, at which point they found the body of Dennis Marsh, Merhi's father, in the basement. Dennis likewise had been stabbed to death, suffering from multiple wounds. *Id.* The police located additional evidence in the basement, finding: (1) the words "Den-

3. Appellant's blood was drawn and later testing revealed a blood alcohol concentration (BAC) over .10%.

4. At the penalty hearing, Trooper Raymond Judge testified to appellant's unsolicited inculpatory statements, which appellant made while police were photographing his injuries at the hospital pursuant to a search warrant. N.T., 5/9/11, at 245.

ise is a Whore" written on the wall in what was later determined to be appellant's own blood; (2) a light-blue t-shirt bearing the Superman logo; and (3) a green canvas duffle bag containing some of appellant's personal belongings. The police also found a white cotton sleeveless undershirt in the first floor bathroom.[5] During a search of Merhi's Grand Prix, police recovered the Muelo Ruko knife and a butcher knife that police believed came from Merhi's home. Both knives contained DNA evidence of appellant and Zernhelt.

On June 27, 2010, appellant was charged with four counts of criminal homicide,[6] and on April 20, 2011, appellant pled guilty to four counts of first-degree murder.[7] On May 17, 2011, after a penalty phase hearing, the jury returned a sentence of death on each of the four counts. Regarding the murder of Merhi, the jury found two aggravators, 42 Pa.C.S. § 9711(d)(10) (multiple first-degree murders here) and 42 Pa.C.S. § 9711(d)(11) (previous murder conviction), and one mitigator, 42 Pa.C.S. § 9711(e)(2) (extreme mental or emotional disturbance). Regarding the murder of Dennis Marsh, the jury found one aggravator (§ 9711(d)(10)) and no mitigators. Finally, regarding the murders of Alvin Marsh and Zernhelt, the jury found two aggravators (§ 9711(d)(10), (11)) and no mitigators as to each victim.

Appellant did not file post-sentence motions, but he filed a direct appeal to this Court on June 14, 2011. Upon the order of the trial court, appellant filed a concise statement of matters complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b) on June 29, 2011. On December 14, 2011, the trial court issued its Rule 1925(a) Opinion.[8]

On appeal, appellant presents thirteen penalty phase ques-

5. At the penalty hearing, Trooper Judge testified that surveillance footage from the ACCC showed appellant wearing a similar undershirt that morning until he put on the Superman t-shirt and left the correction center. N.T., 5/9/11, at 225–26.

6. 18 Pa.C.S. § 2501(a).

7. 18 Pa.C.S. § 2502(a).

8. Pa.R.A.P.1925(a).

tions for review; we summarize appellant's issues as follows:[9]

(1) Whether the trial court erred in permitting the introduction of several autopsy and crime scene photographs.

(2) Whether the trial court erred in allowing the Commonwealth to cross-examine the following mitigation witnesses:

(a) Dr. Ruben Gur, regarding an MRI report the Commonwealth did not receive until the morning of his testimony, his personal beliefs about the death penalty, his testimony in eleven prior state and federal cases, and the exclusion of his testimony in *United States v. Montgomery*;

(b) Penny Sines, regarding her opinion whether appellant was a low risk to reoffend, and about the parole board's decision to grant appellant parole in 2007;

(c) Dr. Richard Fruncillo, about alcohol not preventing appellant from forming the specific intent to kill, and about appellant's 1991 homicide and prison misconduct history; and

(d) Dr. Gerald Cooke, regarding a letter appellant wrote to his mitigation specialist, and a diagram appellant drew of the crime scene.

(3) Whether the trial court erred in allowing the Commonwealth to call five rebuttal witnesses who did not rebut evidence presented by the defense.

(4) Whether the trial court erred in admitting victim impact testimony because victim impact testimony is unconstitutional, or, alternatively, because select statements made at trial did not constitute proper victim impact testimony.

(5) Whether the trial court erred in denying appellant's requested jury instructions that there is a presumption of life in capital cases and that the death sentence is never required.

9. We rephrase the questions for brevity and clarity. We also follow the order of appellant's issues as they were compiled and addressed by the trial court, which reordered the issues for clarity.

(6) Whether the jury's imposition of the death sentence was the result of passion, prejudice, or other arbitrary factor.

(7) Whether appellant's sentence was against the weight of the evidence.

(8) Whether the trial court erred in denying appellant's motion to list on the verdict slip all fifteen mitigating factors for which appellant submitted evidence.

## I. Sufficiency of the Evidence: Murder of the First Degree

On appeal, appellant has raised no argument regarding the sufficiency of the evidence. However, "in all capital direct appeals, this Court reviews the evidence to ensure that it is sufficient to support the first-degree murder conviction." *Commonwealth v. Sanchez*, 614 Pa. 1, 36 A.3d 24, 37 (2011). This is so even where the appellant has pled guilty to first-degree murder. *See, e.g., Commonwealth v. Flor*, 606 Pa. 384, 998 A.2d 606, 615 (2010); *see also Commonwealth v. Fears*, 575 Pa. 281, 836 A.2d 52, 62 (2003) ("Safeguards exist to protect against an arbitrary imposition of the death sentence.... These protections act to prevent the imposition of a death sentence based solely upon a defendant's proclamation of guilt."). Sufficiency review usually entails ascertaining whether the evidentiary record, as well as all reasonable inferences derived therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish the criminal offense beyond a reasonable doubt. *Sanchez*, 36 A.3d at 37. However, where a defendant pleads guilty to first-degree murder, which obviates the need for a guilt phase trial or a degree of guilt hearing, the evidentiary record we have reviewed has taken several forms. *Compare Flor*, 998 A.2d at 615 (sufficiency assessed on evidence introduced at penalty phase hearing) *with Fears*, 836 A.2d at 59 (assessed on evidence presented at suppression hearing and summarized by Commonwealth at plea colloquy). We recognize that, where there is a contested penalty phase, the Commonwealth, in order to provide context, often puts on a

full, or a near-full, account of its case at that phase. *See, e.g.,* *Flor,* 998 A.2d at 615 (In conducting sufficiency review, Court notes that "[t]he penalty phase hearing, which was conducted before a jury, was remarkably thorough."). On the other hand, in plea cases:

> [I]t simply may not always be possible to conduct traditional sufficiency review relative to the underlying conviction in the plea cases. Accordingly, in such cases it should be appropriate to center the obligatory review on the factual basis for the plea as developed during the course of the plea colloquy, in line with the general approach for reviewing pleas to other offenses, *see generally Commonwealth v. Hines* [496 Pa. 555], 437 A.2d 1180 (Pa.1981).

*Commonwealth v. Frey,* 588 Pa. 326, 904 A.2d 866, 875 (2006) (Saylor, J., concurring). *See also Commonwealth v. Jordan,* 619 Pa. 513, 65 A.3d 318, 337 (2013) (Castille, C.J., concurring) ("[O]ur evaluation of sufficiency must encompass the plea.").

■ Because evidentiary sufficiency is a question of law, our standard of review is *de novo* and our scope of review is plenary. *Sanchez,* 36 A.3d at 37. An individual commits first-degree murder when he intentionally kills another human being; an intentional killing is defined as a "willful, deliberate and premeditated killing." 18 Pa.C.S. §§ 2501, 2502(a), (d). To sustain a conviction for first-degree murder, the Commonwealth must prove that: (1) a human being was unlawfully killed; (2) the accused was responsible for the killing; and (3) the accused acted with malice and a specific intent to kill. *Sanchez,* 36 A.3d at 37. Moreover, a fact-finder may infer the intent to kill "based on the accused's use of a deadly weapon on a vital part of the victim's body." *Id.* The intimacy involved in stabbing one's victim to death clearly indicates malice and specific intent. *See, e.g., Commonwealth v. Marrero,* 546 Pa. 596, 687 A.2d 1102, 1105 (1996).

■ The record in this case, as it was developed by the guilty plea proceeding and the sentencing hearing, is replete with admissions, physical evidence and eyewitness testimony

that supports appellant's plea and resulting conviction. Appellant accepted responsibility and formally admitted that he murdered the four victims. His plea followed upon a Commonwealth proffer that established that on June 26, 2010, appellant, agitated over hearing that Merhi was seeing another man, went to her house to confront her. On his way to Merhi's residence, appellant purchased a knife and called Merhi several times in an attempt to confirm his suspicions. When appellant arrived at the home, he found Merhi, her father, and her grandfather. Appellant proceeded to stab each of them repeatedly. When the family's next door neighbor, Steven Zernhelt, came to the residence to check on them, appellant stabbed him as well. All four of the victims died from their wounds. During the plea colloquy, the Commonwealth introduced: [10] (1) photographic evidence of the crime scene (N.P., 4/20/11, at 17–19); (2) the death certificates for each victim and accompanying reports from the coroner and forensic pathologist (*id.* at 19–25); and (3) testimony from Trooper Raymond Judge, who verified the results of his investigation, which included, *inter alia,* appellant's inculpatory statements, witness statements and surveillance footage indicating appellant's travel towards and his subsequent flight from Merhi's house (*id.* at 27–34). The Commonwealth also summarized the remainder of its evidence: appellant's several confessions to police; the murder weapons that were found in Merhi's car; and appellant's personal possessions discovered at the scene, including his bloody distinctive t-shirt, which were found in Merhi's basement. The Commonwealth formally introduced this evidence at the penalty hearing.

There being no question that the four victims were unlawfully killed, the evidence amply proved that appellant was responsible for the killings. The Commonwealth proved motive, which supported that appellant was the killer, via appel-

10. Prior to the guilty plea proceeding, the parties stipulated that the Commonwealth's exhibits were only submitted for the purposes of the guilty plea and that the parties would revisit at a later time which exhibits would be introduced at the penalty hearing. We note that other than several photographs, discussed *infra,* there was no evidence introduced during the plea colloquy that was not later introduced at the penalty hearing.

lant's several phone calls to Merhi the day of the murders and his writing "Denise is a Whore" in his own blood on the basement wall. The physical evidence, such as the murder weapons, appellant's belongings, and blood found in the home, place appellant at the scene of the crime. Finally, the nature of the killings, which appellant alone committed without an accomplice, established malice and specific intent; the victims were each stabbed numerous times (Merhi, who was the object of appellant's jealousy, suffered forty-three wounds) with a "survival combat-type" knife that appellant was "meticulous and purposeful in selecting." [11] The plea record overwhelmingly supports appellant's plea to all four counts of first-degree murder.

## Penalty Phase Claims

### II. Photographs of the Victims' Bodies

First, appellant claims that the trial court abused its discretion in admitting several autopsy and crime scene photographs depicting, *inter alia,* the victims' bodies and appellant's writing on the basement wall.[12] Appellant argues that the photographs were inflammatory and that they lacked evidentiary value in light of the fact that he pled guilty to the murders. Appellant also contends that the photographs were merely duplicative of the testimonies of Dr. Land, the forensic pathologist, and Dr. Lysek, the coroner, and that these witnesses could have given a thorough account of what they observed without using the photographs. According to appellant, even if the photographs were relevant, their relevance failed to outweigh the likelihood that their "extremely gory" nature

11. Trooper Raymond Judge testified that: "[Appellant] spent what I would consider a significant amount of time testing the balance of the knife, the heft, the sharpness, the quality of the knife. He was meticulous and purposeful in selecting one particular knife." N.P., 4/20/11, at 29.

12. Specifically, appellant questions the admission of Crime Scene Photographs H, K, P, and Q (which depicted victims Zernhelt, Merhi, and Alvin Marsh), Crime Scene Photographs U, Y, and AA (which depict the phrase "Denise is a Whore" that appellant wrote on the basement wall in his own blood), and the autopsy photographs depicting each of the four victims. Appellant's Brief at 25–31.

would prejudice the jury. Lastly, appellant asserts that the trial court's precautionary measures, which consisted of a jury instruction and a requirement that the Commonwealth publish designated photographs in black and white, did not eliminate the inflammatory nature of the photographs. *See* Appellant's Brief at 27 (citing *Commonwealth v. Chacko*, 480 Pa. 504, 391 A.2d 999, 1000 (1978) (black and white photographs may still be inflammatory), and *Commonwealth v. Powell*, 428 Pa. 275, 241 A.2d 119, 121 & n. 1 (1968) (photographs still deemed prejudicial despite cautionary instruction because nature and extent of injuries had no bearing on finding of felony murder)).

The Commonwealth responds that the photographs were relevant to explain to the jury what Dr. Lysek observed when he entered the residence after the murders. The Commonwealth claims that the writing on the basement wall explains appellant's clear purpose—that this was a "revenge killing" after appellant learned that Merhi was seeing another man. The Commonwealth also argues that the photographs were offered to rebut appellant's potential defense regarding his state of mind at the time of the murders. According to the Commonwealth, the trial court took appropriate precautionary measures to prevent any undue prejudice.

The trial court agreed with the Commonwealth that although some of the photographs were potentially inflammatory, they were relevant to explain the development of the crime to the jury, especially since the jury here was empanelled solely for the penalty phase of trial. The court also explained that it individually reviewed each photograph and applied the appropriate balancing test to determine its admissibility. Trial Ct. Op. at 28–41. The court, acknowledging the possibility that neither of its precautionary measures alone may have completely sanitized the inflammatory nature of the photographs, nevertheless determined that the measures, used together, accomplished that purpose here.

"The admissibility of evidence is at the discretion of the trial court and only a showing of an abuse of that discretion, and resulting prejudice, constitutes reversible er-

ror." *Sanchez*, 36 A.3d at 48. Our Court also has repeatedly held that "a capital sentencing hearing is not a sanitized procedure limited only to the evidence of aggravating circumstances." *Commonwealth v. Eichinger*, 591 Pa. 1, 915 A.2d 1122, 1140 (2007) (citing *Commonwealth v. Saranchak*, 544 Pa. 158, 675 A.2d 268, 275 (1996) and *Commonwealth v. Marshall*, 537 Pa. 336, 643 A.2d 1070, 1074 (1994)). In Pennsylvania, photographic evidence of a murder victim is not *per se* inadmissible; instead, the admissibility of photographic evidence depicting a murder victim involves a two-part analysis. *Eichinger*, 915 A.2d at 1142. "The court must first determine if the photograph is inflammatory and then, if it is, the court must apply a balancing test to determine whether the photograph is of such essential evidentiary value that its need clearly outweighs the likelihood of inflaming the minds and passions of the jury." *Id.* (applying two-part test to autopsy photographs); *see also Marshall*, 643 A.2d at 1074–75 (applying same rationale to crime scene photographs).

 In capital cases where a jury is empanelled only for the penalty phase of trial, photographs have essential evidentiary value if they help inform the jury about the history and natural development of the facts of the case, or if they potentially rebut mitigation evidence. *Eichinger*, 915 A.2d at 1142; *Marshall*, 643 A.2d at 1075 (photographs depicting victims in condition they were found as result of crimes were admissible because they assisted jury in understanding facts of victim's death and provided "insight into the nature of the offenses"). Further, "[t]he availability of alternate testimonial evidence does not preclude the admission of allegedly inflammatory evidence." *Sanchez*, 36 A.3d at 49 (citing *Commonwealth v. Tharp*, 574 Pa. 202, 830 A.2d 519, 531 (2003)). Our Court has only found that a trial court has abused its discretion in admitting such photographs when the situation generally entails indifference from the trial court or the Commonwealth to the photographs' prejudicial effect, or where the precautions taken were not commensurate with the nature of the scene depicted. *See, e.g., Chacko*, 391 A.2d at 1000–01 (measures not enough to cure prejudice where photo-

graphs were close-up of victim's body at crime scene and depicted large gaping wounds and bloodied clothing).

At a pre-trial hearing on May 6, 2011, the trial court entertained the parties' arguments regarding whether the Commonwealth's photographs would be admitted into evidence. *See* Notes of Motions (N.M.), 5/6/11, at 3–28.[13] The court then admitted only those crime scene photographs that it did not find to be inflammatory (*e.g.*, the writing on the wall), and photographs of both the crime scene and autopsy that, "for the most part" were inflammatory, but whose evidentiary value the court found to be "essential." *Id.* at 27. The court required all photographs in the latter group to appear in black and white. *See* Trial Ct. Op. at 31, 38. The court excluded photographs that it found redundant or overly gruesome (*e.g.*, close-up pictures of uncleaned wounds at the crime scene). *Id.* at 17–18, 24, 26. The court also instructed the jury as follows:

Ladies and gentlemen, some of the photographs you are about to see are very difficult to look at. They are very important for you to see to understand the nature and circumstance of the offenses. But you must carefully guide against allowing these photographs to inflame your passions. The photographs are being introduced so you understand what happened, but you still must make a rational decision that cannot be based on prejudice or emotion. It's very important that you follow that instruction.

N.T., 5/9/11, at 77–78; *see also* N.T., 5/17/11, at 191–192 (similar instruction during jury charge).

Here, it is clear that the trial court carefully exercised its discretion. Although the court's precautionary measures could not completely sanitize the inflammatory nature of the photographs, such is not the test for admissibility. The court reviewed each photograph individually and correctly applied

13. The photographs in question were all admitted during the guilt phase (entrance of the guilty plea), subject to review for introduction at the penalty phase. Therefore, it appears that there was no issue that all photographs were relevant for the purposes of Pa.R.E. 402, subject to the two-part test for undue prejudice.

the two-part test to each photograph. Of the photographs the court found inflammatory, it allowed only those that it believed were necessary to explain to the jury the nature of the offenses. Furthermore, the court's precautionary measures show a reasoned acknowledgment of the photographs' potential to inflame the jury, and steps to reduce that potential. The court clearly explained the measures that it felt were justified with respect to each photograph, and where the photograph was too inflammatory, exclusion was the remedy. The trial court acted within its discretion, and within the bounds of the decisional law governing this area. Hence, appellant's claim fails.

### III. Cross–Examination of Mitigation Witnesses

Next, appellant claims that the trial court abused its discretion in permitting the Commonwealth to cross-examine four of his mitigation witnesses regarding matters appellant believes were either irrelevant or prejudicial. Appellant alleges error in the Commonwealth's cross-examination of: Dr. Ruben Gur, an expert in neuropsychology and neuroimaging; Penny L. Sines, appellant's social worker from 2002 until his first parole; Dr. Richard Fruncillo, a forensic toxicologist; and Dr. Gerald Cooke, a forensic psychologist. We will review the claims regarding each witness, but we first note the standard of review for claims regarding alleged improper cross-examination of witnesses.

Pennsylvania Rule of Evidence 611(b) addresses the scope of cross-examination, stating: "Cross-examination of a witness other than a party in a civil case should be limited to the subject matter of the direct examination and matters affecting credibility; however, the court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination." Pa.R.E. 611(b). "Cross-examination may be employed to test a witness' story, to impeach credibility, and to establish a witness's motive for testifying. The scope of cross-examination is a matter within the discretion of the trial court and will not be reversed absent an abuse of that discretion." *Commonwealth v. Chmiel,* 585 Pa. 547, 889 A.2d

501, 527 (2005) (citation and quotation marks omitted). This standard applies equally with respect to expert witnesses, *see Woodland v. Philadelphia Transp. Co.*, 428 Pa. 379, 238 A.2d 593, 596 (1968), and the weight given to expert testimony is then determined by the trier of fact. *Freed v. Geisinger Med. Ctr.*, 607 Pa. 225, 5 A.3d 212, 216 (2010) (opinion on reargument) (internal citations omitted).

## A. Cross–Examination of Dr. Ruben Gur

Appellant claims that the trial court abused its discretion in allowing the Commonwealth to cross-examine Dr. Gur regarding: (1) his failure to deliver an MRI report to the Commonwealth; (2) his personal beliefs about the death penalty; (3) his prior testimony in eleven state and federal cases; (4) a federal court's exclusion of his testimony in *United States v. Montgomery*, 635 F.3d 1074 (8th Cir.2011).[14] Dr. Gur conducted a neuropsychological assessment of appellant based on PET and MRI exams of appellant's brain and results of neuropsychological testing performed by Dr. Cooke. N.T., 5/16/11, at 12–14. On direct examination, Dr. Gur testified that, in his expert opinion, appellant suffered from brain damage. On cross-examination, the Commonwealth introduced a report from February 2011 ("Report") issued by the radiologist who performed the MRI on appellant, and asked Dr. Gur why he had not included the Report in his own evaluation.[15] Dr. Gur agreed that the Report indicated that the MRI was "unremarkable," but then explained that he did not rely on the Report in rendering his opinion because it was a clinical reading of the MRI, which is not capable of detecting the effects of traumatic brain injury. *Id.* at 82–93.

**14.** In *United States v. Montgomery,* the District Court for the Western District of Missouri excluded Dr. Gur's proposed testimony about whether the defendant suffered from any mental abnormality, injury, or illness because it found that the testimony had minimal probative value, and because of a dispute over whether Dr. Gur's calculations would confuse the jury. 635 F.3d at 1082.

**15.** Dr. Gur did not provide the Commonwealth with the MRI Report until the Commonwealth specifically requested it the morning Dr. Gur testified.

With regard to the MRI Report, appellant alleges that the Commonwealth created an unfair inference that the defense intentionally failed to disclose relevant information. Appellant claims that because Dr. Gur did not rely on the Report in formulating his opinion, cross-examination about the Report was improper. Appellant also claims that Dr. Gur's personal opinion of the death penalty is not relevant to show his bias. Appellant relies on *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831 (2003) for the proposition that a witness's personal opinion about the death penalty is inadmissible; appellant also believes that such opinions should be excluded pursuant to Pennsylvania Rule of Evidence 610 (evidence of witness's opinion on matters of religion are not admissible to attack credibility). Finally, appellant claims that the Commonwealth's inquiry into Dr. Gur's prior testimony in capital cases was improper because it exceeded the scope of direct examination and portrayed him as a "hired gun." Appellant's Brief at 38. According to appellant, questioning Dr. Gur about the exclusion of his testimony in *U.S. v. Montgomery* was especially irrelevant because the standard in Pennsylvania for the admission of expert testimony is different from the federal standard, and therefore the federal court's decision to exclude his testimony is irrelevant to Dr. Gur's credibility. *See* Appellant's Brief at 39–41 (explaining different standards in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923) and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).[16]

The Commonwealth responds that its lines of questioning were relevant to Dr. Gur's credibility and the weight that the jury should attribute to his opinion. Specifically, the Commonwealth argues that the Report, which found the MRI of appellant "unremarkable," directly contradicts Dr. Gur's finding of brain damage. Further, the Commonwealth argues that it was entitled to question Dr. Gur about the Report because the MRI was taken at appellant's request. Even if Dr. Gur had not relied upon the Report, the Commonwealth

16. *Frye* is still the prevailing standard in Pennsylvania. *See Grady v. Frito–Lay, Inc.*, 576 Pa. 546, 839 A.2d 1038 (2003).

asserts that it was reasonable to ask why Dr. Gur did not include it in his own estimation of appellant's brain function.

With respect to Dr. Gur's opinion of the death penalty and the inquiry into Dr. Gur's testimony in prior cases, the Commonwealth responds that the questioning was a proper exploration of the doctor's potential biases with a "value of giving the jury a full and accurate view of Dr. Gur's credibility." Appellee's Brief at 22. The Commonwealth posits that appellant's reliance on *Bomar* is misplaced because *Bomar* involved victim impact testimony in which the defendant sought to question the victim's family member about her personal opposition to the death penalty. *See* 826 A.2d at 852. *Bomar* is not applicable here, the Commonwealth argues, where the prosecution was attempting to impeach an expert witness by exploring his bias in favor of the defense. Next, the Commonwealth alleges that Dr. Gur's testimony in prior cases demonstrates a testimonial pattern in favor of capital defendants. Regarding the testimony in *Montgomery*, the Commonwealth contends that the disparity between the state and federal standards for the admissibility of expert testimony is irrelevant to the jury's determination of the doctor's credibility. Finally, the Commonwealth submits that any improper cross-examination questions amounted to harmless error.

The trial court's opinion is consistent with the Commonwealth's arguments on all dispositive points—that the questions went to the credibility and weight of Dr. Gur's conclusion, that the MRI Report appears to contradict his testimony, and that his testimony in other cases is probative of his testimonial bias and credibility.[17] The court also found that

17. In October 2012, this Court entered an order directing the Commonwealth to resubmit its merits brief so that the Commonwealth could discharge its duty to respond to appellant's arguments without simply relying on the trial court's opinion. *See* Order, 10/16/12. The Commonwealth submitted an amended brief on November 26, 2012. While the Commonwealth's amended brief engages appellant's arguments in more detail, particularly by addressing the holdings of cases, such as *Bomar*, that appellant cites, the Commonwealth's brief still closely follows the trial court's opinion. Nonetheless, solely for the ease of exposition, we ascribe the legal theories to the Commonwealth where it

any error was harmless and any prejudice was *de minimus*. Trial Ct. Op. at 50.

 Respecting these claims, we are guided predominantly by our standard of review and our understanding that a proper purpose of cross-examination includes attempts to impeach a witness's credibility. *Chmiel*, 889 A.2d at 527. It is well-settled that "[w]hatever tends to show the interest or feeling of a witness in a cause is competent by way of cross examination." *Grutski v. Kline*, 352 Pa. 401, 43 A.2d 142, 144 (1945) (quoting *Commonwealth v. Farrell*, 187 Pa. 408, 41 A. 382 (1898)). Of course, the relevant dispute here involves the question of which kinds of facts "show the interest" of a witness. *See generally Cooper v. Schoffstall*, 588 Pa. 505, 905 A.2d 482, 494 (2006) (recognizing general proposition that "pattern of compensation in past cases raises" inference that witness may slant testimony to ensure he is hired in future cases). With regard to an expert witness's testimony in prior capital hearings, our Court has addressed this subject before. *See Commonwealth v. Laird*, 605 Pa. 137, 988 A.2d 618, 644 (2010). However, the appellant in *Laird* framed the issue not as one of relevance, but as implicating prosecutorial misconduct, and the Court addressed it as such. *Id.* Of the other jurisdictions that have directly addressed the issues presented, our sister states generally have found such questioning proper, so long as the prosecution does not elicit superfluous facts from prior cases that might confuse the jury. *See Rose v. State*, 787 So.2d 786, 798 (Fla.2001) ("We have in fact recognized a host of matters upon which cross-examining counsel may inquire in demonstration of bias, including, for instance, the frequency with which a defense expert testifies for capital defendants."); *State v. Irish*, 807 So.2d 208, 213–14 (La.2002); *Albarran v. State*, 96 So.3d 131, 172–73 (Ala.Crim.App.2011), *cert. quashed*, 96 So.3d 216 (2012). *Cf. People v. Bennett*, 45 Cal.4th 577, 88 Cal.Rptr.3d 131, 199 P.3d 535, 555–56 (2009) (attorney's opinion on death penalty was permissible subject for cross-examination).

included those theories, followed by the ultimate finding by the trial court.

First, we find no reason advanced by appellant in this matter to reject the general proposition, recognized in other jurisdictions, that a mitigation expert in a capital sentencing hearing may be questioned about his personal beliefs about the death penalty, or about his testimony in prior cases, in order to attempt to establish a testimonial pattern and expose possible bias-so long as the questions are limited to an appropriate number and type of cases, and the thrust of the testimony in those cases. *See, e.g., Eaton v. State,* 192 P.3d 36, 118–19 (Wyo.2008). Although Dr. Gur stated that he did not ask for, nor rely on, the MRI Report, the record reveals that he was aware of its existence and he explained that he believed it would not be helpful in fashioning his own opinion. N.T., 5/16/11, at 91–93. We see no abuse of discretion in allowing the Commonwealth to explore the fact that Dr. Gur disregarded the Report in fashioning his own opinion.[18] This was an appropriate topic for cross-examination, given the radiologist's conclusion in the Report that appellant's MRI was "unremarkable," which properly calls into question Dr. Gur's conclusion that appellant suffered from brain damage. To the extent that appellant disagrees with this inference, he notably used his re-direct examination as an opportunity to advance this argument. *Id.* at 126–30.

Regarding appellant's remaining claims, we see no abuse of discretion in the trial court finding that Dr. Gur's opinion of the death penalty, his testimony in prior cases, and the fact of the exclusion of his testimony in *Montgomery,* were proper areas of inquiry in an attempt to establish that the doctor was an expert with a defense bias in capital cases.[19]

18. "An abuse of discretion exists where the court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." *Flor,* 998 A.2d at 634.

19. Although we ultimately see no abuse of discretion, the questions about *Montgomery,* the federal prosecution in which Dr. Gur's testimony was excluded, pushed the bounds of relevancy given the obvious complications involving factual distinctions, different evidentiary standards, and the dubious relevance of another court's discretionary rulings. To the extent the questioning here could be said to cross the line, we credit the trial court's alternative finding of harmless error, given

The Commonwealth restricted its questioning to the facts essential to showing Dr. Gur's testimonial pattern. Furthermore, the Commonwealth's reading of *Bomar* is correct. *Bomar* held that a victim's relative's opinion of the death penalty was simply not relevant mitigation evidence under Section 9711 of the Sentencing Code.[20] *Bomar*, 826 A.2d at 852. The question before us here is where an expert witness was providing mitigation testimony for a capital defendant, thereby placing the value and credibility of his opinion evidence at issue. A defense expert's opinion on the death penalty may reflect a bias—no less than an expert who commonly testifies for the Commonwealth—thereby affecting the credibility of his conclusions about a defendant's mental state. Appellant's claim fails.

## B. Cross–Examination of Penny Sines

 Appellant next claims that the trial court abused its discretion in allowing the Commonwealth to cross-examine Penny Sines about matters appellant believes were not relevant to her direct testimony. On direct examination, Ms. Sines testified that she was appellant's correctional counselor and that in the two years prior to appellant's 2007 release on parole, appellant was accepted for a position working in the hospice unit of the prison. N.T., 5/12/11, at 11–14. Ms. Sines also described the difficult nature of the job and testified that appellant volunteered for the position. *Id.* This essentially was the extent of Ms. Sines's testimony.

On cross-examination, the Commonwealth questioned Ms. Sines regarding her decisional process in accepting appellant for hospice work, inquiring into whether she had considered appellant's prison record in making that decision. *Id.* at 16–18. The Commonwealth then asked whether she had any role in appellant being granted parole in 2007, to which Ms. Sines responded that she participated in the staffing recommendation that went to the parole board for its review.

the strength of the aggravating factors in this case involving a brutal quadruple murder. *See infra.*

20. 42 Pa.C.S. § 9711 *et seq.*

Appellant now argues that "Ms. Sines was offered to establish appellant had good qualities and compassion, and that it was a difficult job to care for the terminally ill or handicapped inmates." Appellant's Brief at 91. Appellant claims that the Commonwealth's questions were outside the scope of the direct examination and did not address Ms. Sines's credibility. The Commonwealth responds that Ms. Sines's bias and judgment were placed at issue when she testified that she considered appellant "to be of such good character" that he could work in the hospice unit and be recommended for parole. The trial court agreed with the Commonwealth.

Again, although cross-examination may be used to address the credibility of a witness, *Chmiel*, 889 A.2d at 527, the Commonwealth's justification for its cross-examination on those grounds here is dubious. Ms. Sines's testimony on direct was brief and related solely to the fact that appellant had worked in the hospice unit; she did not testify regarding her decisional process or appellant's parole. Ms. Sines also did not express any opinion regarding appellant, but merely testified that he had a job in the hospice unit and had volunteered for it. Although the Commonwealth was certainly entitled to attempt to show the witness's bias, its inquiry into Ms. Sines's opinion of appellant in 2007 (which factored into her decisions to (a) select him for a job in the hospice unit and (b) join a staff recommendation that led to his parole) appeared only to call into question her judgment on points not proffered by appellant. In any event, we cannot say that the trial court's determination to allow the Commonwealth to deviate from the relevant scope of cross-examination prejudiced appellant.

Harmless error exists where: (1) the error did not prejudice the defendant or the prejudice was de minimis; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so

insignificant by comparison that the error could not have contributed to the verdict.

*Fears*, 836 A.2d at 69 n. 18 (citing *Commonwealth v. Robinson*, 554 Pa. 293, 721 A.2d 344, 350 (1998)). Here, Ms. Sines's testimony was very narrow and limited in effect. At worst, the Commonwealth's line of inquiry on cross-examination recounted facts already presented (*e.g.*, appellant's misconduct history and 2007 parole). Given the overwhelming evidence of the significant aggravating factors here, a case involving four brutal murders, we find any error to be harmless, and appellant's claim therefore fails.

### C. Cross–Examination of Dr. Richard Fruncillo

Next, appellant claims that the trial court abused its discretion in allowing the Commonwealth to cross-examine his forensic toxicologist, Dr. Fruncillo, about matters appellant believes were not relevant to Dr. Fruncillo's direct testimony. During direct examination, Dr. Fruncillo testified that, based on his calculations, appellant had a .168% blood alcohol level at the time of the murders. N.T., 5/12/11, at 70. Dr. Fruncillo also testified that appellant had an elevated blood testosterone level, due to taking over-the-counter supplements, and opined that this elevated level, coupled with the alcohol, would have increased appellant's aggressiveness. *Id.* at 66–71. On cross-examination, the Commonwealth asked Dr. Fruncillo about: (1) whether alcohol prevented appellant from forming the specific intent to kill; (2) appellant's prison misconduct history; and (3) appellant's 1991 murder conviction. Appellant now alleges that these questions were irrelevant and that specific intent was not at issue because he had pled guilty to the murders. Appellant also contends that the Commonwealth intentionally tried to insert appellant's propensity for violence at the penalty phase, and that Dr. Fruncillo could only testify to the way appellant would behave while intoxicated. The Commonwealth responds that appellant was trying to mitigate his culpability for the crimes through Dr. Fruncillo's expert conclusion that alcohol and testosterone consumption increased appellant's aggressiveness. According to the Com-

monwealth, the line of questioning was proper because it either spoke to culpability, which is directly related to the specific intent to kill, or showed that appellant can be aggressive without alcohol or increased testosterone levels by referring to violent episodes where neither substance was a factor.

Given our deferential standard of review and the undeveloped nature of appellant's claims, we see no abuse of discretion in the trial court determining that these were proper areas of cross-examination. To the extent that appellant implies that these questions were overly prejudicial, he does not develop those arguments in his brief, *see* Appellant's Brief at 94–96, and given our prior discussion of harmless error, we fail to see any prejudice. Thus, appellant's claim fails.

### D. Cross–Examination of Dr. Gerald Cooke

Appellant's final claim relating to the Commonwealth's cross-examination of his mitigation witnesses involves the testimony of psychologist Dr. Gerald Cooke. On direct examination, Dr. Cooke testified that he gave appellant a neuropsychological test and reviewed many documents related to appellant's case, including a letter that appellant wrote to his mitigation specialist Louise Luck, recounting the murders. N.T., 11/13/11, at 231–33. Dr. Cooke also testified that after his evaluation, he concluded that "there was a sufficient past history of multiple traumatic brain injuries," and that appellant seemed to have a memory deficit, *i.e.*, that he has an issue "retaining what he registers." *Id.* at 243, 251. On cross-examination, the Commonwealth asked Dr. Cooke about the letter, followed by several questions regarding a picture appellant drew of himself standing over Merhi's body in the kitchen just after the murder. *Id.* at 279–80. Appellant objected to the introduction of the drawing, and the trial court conditioned its introduction on Dr. Cooke first testifying that appellant's brain damage would hinder him from drawing a picture. *Id.* at 282–84. The Commonwealth, in attempting to elicit such a statement, referenced the drawing. *Id.* Appellant claims that the prosecutor's questions regarding the letter and the sketch

were outside the scope of direct examination and were therefore improper.

Appellant waived his claims regarding questions respecting the relevance of both the letter and the sketch by failing to object on those grounds at trial. N.T., 5/13/11, at 274–79. Regarding the sketch, appellant's objection at trial was only to its introduction into evidence. After the sidebar following this objection, the Commonwealth made two references about the letter to Dr. Cooke in order to set a basis to introduce the sketch; the Commonwealth was unsuccessful, but importantly, appellant did not object to these questions.[21] Therefore, his present arguments are waived. See Pa.R.A.P. 302.

## IV. Testimony of Rebuttal Witnesses

Next, appellant claims that the trial court abused its discretion in permitting the Commonwealth to present the testimony of five rebuttal witnesses—four who were offered to rebut the testimony of defense witness Dr. Robert Johnson, a penologist, who testified that appellant could adapt well to a sentence of life imprisonment; and one witness who was offered to rebut appellant's evidence that he had a poor relationship with his father. According to appellant, none of the Commonwealth's witnesses provided testimony that directly rebutted evidence presented by the defense, and therefore the testimony was irrelevant; he also claims the testimony was prejudicial.

Concerning appellant's adaptation to life imprisonment, appellant challenges the testimony of Warden Todd Buskirk and Lieutenant Conrad Lamont of the Northampton County Prison; Danielle Kaufman, a woman who regularly visited appellant at the prison; and Dr. Veronique Valliere, a clinical psychologist who directed an outpatient rehabilitation and violent offender program in which appellant participated. Warden Buskirk testified about an incident from March 2011 in which appellant, awaiting the sentencing hearing in this case, barricaded himself in his cell; a team of guards had to

---

**21.** Moreover, appellant does not devote more than a sentence in his brief to make a claim regarding the letter. See Appellant's Brief at 97.

forcibly enter and subdue appellant. N.T., 5/17/11, at 7–9. Ms. Kaufman and Lt. Lamont each testified regarding an incident in which appellant wrote a threatening letter to Lt. Lamont; Ms. Kaufman delivered the letter for appellant. *Id.* at 14–16, 24–25. Dr. Valliere testified that, according to her observations of appellant in 2008, appellant was not amenable to treatment in her program and was noncompliant. Based on her observations, Dr. Valliere concluded that appellant has an antisocial personality disorder and that he was a danger to others, even in a prison setting. *Id.* at 45–49. Finally, on the issue of appellant's relationship with his father, Trooper Raymond Judge of the Pennsylvania State Police testified that, based on his observations, appellant appeared to have an amicable relationship with his father. Trooper Judge testified that he listened to (and documented) ten to twelve phone calls between appellant and his father while appellant was incarcerated prior to the sentencing hearing, remarking that the calls were "cordial." N.T., 5/17/11, at 30–33.

First, appellant argues that these witnesses could only testify to appellant's presentence behavior, which, according to appellant, is distinguishable from the question of whether he could adapt to life imprisonment. For this proposition, appellant relies on Dr. Johnson's opinion that incidents of misconduct during a defendant's pretrial incarceration are not indicative of post-sentence behavior. *See* N.T., 5/13/11, at 199–200. Appellant also contends that his letter to Lt. Lamont is irrelevant because he never acted on the threat. With respect to Dr. Valliere, appellant believes that her opinion was irrelevant because she did not observe appellant in a prison setting, nor did she review his prisoner file, his school records, or his MRI or PET scans (for evidence of brain injury). Appellant also argues that because Dr. Valliere is neither a medical doctor nor a penologist she was not qualified as an expert witness for the purpose of rebutting Dr. Johnson's testimony. With respect to Trooper Judge, appellant argues that evidence of his current relationship with his father does not rebut testimony from appellant's mitigation expert that appellant

had an abusive relationship with his father when he was younger.

The Commonwealth responds that of the first four witnesses, each witness provided testimony that is probative of whether appellant possibly could be a nonviolent prisoner who is not a danger to others. With regard to Trooper Judge, the Commonwealth responds that appellant's mitigation witnesses testified about his relationship with his father well into appellant's adulthood, *see, e.g.*, N.T., 5/13/11, at 73–74, opening the door for Trooper Judge's observations on the matter. The trial court agreed with the Commonwealth. First, the court found that because the jury was free to disbelieve Dr. Johnson's opinion that pre-sentence instances of misconduct do not accurately predict future behavior of life sentenced prisoners, the Commonwealth's evidence spoke to the weight that the jury should give to Dr. Johnson's testimony. The court also found that appellant waived his claims regarding Ms. Kaufman and Lt. Lamont because he failed to preserve them at trial. Respecting Trooper Judge, the court found that not only had appellant opened the door to evidence of his relationship with his father during adulthood, but that the testimony could also potentially rebut evidence of a poor relationship during childhood, were the jury inclined to disbelieve appellant's witnesses.

"It is clear that a defendant may present any admissible evidence relevant to any mitigating circumstance, including any evidence regarding the character and record of the defendant ... [but] the defendant is not entitled to present, without challenge or rebuttal by the Commonwealth, false or misleading evidence or to create a false impression of his character or record." *Commonwealth v. Travaglia*, 611 Pa. 481, 28 A.3d 868, 878 (2011) (internal citations omitted). Furthermore, "the admission of rebuttal testimony is within the sound discretion of the trial court," *Commonwealth v. Fletcher*, 561 Pa. 266, 750 A.2d 261, 278 (2000), and the appropriate scope of rebuttal evidence is defined by the evidence that it is intended to rebut. *Commonwealth v. Hughes*, 581 Pa. 274, 865 A.2d 761, 797 n. 40 (2004) (citing *Common-*

*wealth v. Hickman,* 453 Pa. 427, 309 A.2d 564, 567 (1973)). "[W]here the evidence proposed goes to the impeachment of the testimony of his opponent's witnesses, it is admissible as a matter of right. Rebuttal is proper where facts discrediting the proponent's witnesses have been offered." *Flowers v. Green,* 420 Pa. 481, 218 A.2d 219, 220 (1966).

First, from a review of the record, we note that the trial court correctly found that appellant waived his claims regarding the testimony of Danielle Kaufman and Lt. Lamont by failing to object at trial. *See* Pa.R.A.P. 302(a). With respect to the testimony of the remaining witnesses, Warden Buskirk, Dr. Valliere, and Trooper Judge, appellant's characterization of proper rebuttal evidence is too narrow. For example, simply because a party's witness asserts a fact does not mean that a party opponent cannot challenge, or rebut, or logically undermine the assertion. Thus, the fact that Dr. Johnson held the view that incidents of pre-trial misconduct while incarcerated are not indicative of how a defendant will act once sentenced does not establish that debatable proposition as a matter of law; the Commonwealth could logically rebut that assertion with appellant's actual conduct while in prison. Thus, we see no abuse of discretion in the trial court's finding that appellant's objections speak to the weight of the proffered testimony, and not to its admissibility. *See Commonwealth v. Hanible,* 612 Pa. 183, 30 A.3d 426, 463–64 (2011). Notably, appellant exercised his ability to challenge the credibility and probative value of each witness's testimony by making these very points during cross-examination. *See, e.g.,* N.T., 5/17/11, at 50–53 (cross-examination of Dr. Valliere); *Chmiel,* 889 A.2d at 527. Warden Buskirk and Dr. Valliere testified to appellant's prior misconduct in prison; Dr. Valliere further testified that, in her expert opinion, appellant's violent behavior was due to a "foundational disorder that [his] character [is] built around." N.T., 5/17/11, at 46. The question of whether this testimony accurately predicts appellant's future conduct any more accurately than Dr. Johnson's testimony was a question properly left for the jury to decide. The same can be said for the testimony of Trooper Judge. Because

there was no abuse of discretion in admitting the above testimony as rebuttal, appellant's claim of trial court error fails.

## V. Victim Impact Testimony

### A. Constitutionality

Next, appellant advances several theories attacking the constitutionality of victim impact testimony. First, appellant claims that the victim impact testimony presented by the Commonwealth in this case was so excessive and prejudicial that it violated his rights under both the U.S. Constitution and the Pennsylvania Constitution.[22] Appellant asserts that both the quantity and tenor of the victim impact testimony here "interjected an arbitrary outpouring of grief" that deprived him of an impartial jury, and that the testimony was prejudicial because it focused the jury's attention on the victims' lives rather than on appellant's crimes which ended those lives. Appellant also makes a broader argument: that victim impact testimony will always, by its nature, evoke a purely emotional reaction from the jury that deprives an accused of a fair trial. According to appellant, a sentencing hearing is held for the sole purpose of allowing a jury to determine the existence of, and to weigh, statutory aggravating and mitigating circumstances. Appellant argues that victim impact testimony is not essential to that purpose. Appellant concedes that our Court has found victim impact testimony to be constitutional under both federal and state law, but he nevertheless requests that we revisit those decisions in the interest of "fairness" and to discharge our statutory duty to review appellant's death penalty for passion and prejudice. Finally, appellant claims that the statute allowing victim impact testimony, 42 Pa.C.S. § 9711(a)(2), is unconstitutional because it lacks specific guidance to juries regarding how they must consider such testimony against the statutory

**22.** Appellant grounds his claim in both the right to due process and his right to be free from cruel and unusual punishment, but fails to develop a specific argument under either provision, nor does he claim that the federal and state provisions are other than coterminous in their scope and contour.

aggravating and mitigating circumstances testimony. According to appellant, the lack of guidance means either that victim impact testimony adds an arbitrary element into the jury's determination, or worse, it becomes its own *de facto* aggravating factor, a result inconsistent with Section 9711(d), which provides an exclusive list of aggravating circumstances.[23] In this way, appellant argues, Section 9711(a)(2) violates various federal decisional law. Appellant's Brief at 60 (citing, *inter alia, Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) for proposition that the jury's discretion must be suitably directed and limited to minimize the risk of arbitrary and capricious capital sentencing).

The Commonwealth argues that appellant has conceded that the law in Pennsylvania is settled with regard to victim impact testimony, and then unhelpfully relies wholly on the opinion of the trial court. With respect to appellant's claim that the victim impact testimony at trial was excessive, the trial court found appellant's argument waived, but further noted that even if appellant had preserved the claim, the testimony of the six victim impact witnesses was not excessive given that there were four murder victims. The court concluded that the testimony admitted here was not any different from victim impact testimony properly admitted in other cases: "all of the witnesses were family members, their testimony was relatively brief, and the testimony related to the victims and the impact the homicides had on the families." Trial Ct. Op. at 78–79. The court also noted that, due to the nature of the crimes, some display of emotion in the courtroom is inevitable and any displays here did not warrant reversal. Finally, the court agreed with appellant that although the Sentencing Code instructs the jury **when** it shall consider victim impact testimony,[24] it does not explain **how** to weigh the testimony.

**23.** *See* 42 Pa.C.S. § 9711(d) ("Aggravating circumstances shall be limited to the following: [18 circumstances]").

**24.** The trial court also submitted that it complied with 42 Pa.C.S. § 9711(c)(2) ("The court shall instruct the jury that if it finds at least one aggravating circumstance and at least one mitigating circumstance, it shall consider, in weighing the aggravating and mitigating circum-

However, the court found no support for appellant's claims that this scheme renders Section 9711(a)(2) unconstitutional.

■ In 1987, the U.S. Supreme Court expressly prohibited the introduction of victim impact testimony at a capital sentencing hearing, holding that such testimony is irrelevant to the proceedings and that it "creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." *Booth v. Maryland,* 482 U.S. 496, 502–03, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) (testimony at issue (a) described personal characteristics of victims and emotional impact crimes had on family; and (b) proffered family's opinion and characterization of crime and defendant). In 1991, however, the High Court overruled *Booth,* declaring that "a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant," especially given the state's interest in rebutting a defendant's mitigation evidence. *Payne v. Tennessee,* 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (allowing testimony regarding impact to family members). Our Court has likewise held that victim impact testimony admitted under Section 9711(a)(2) is constitutional, beginning with our decision in *Commonwealth v. Means,* 565 Pa. 309, 773 A.2d 143 (2001) (plurality); *see also id.* at 159–60 (Saylor, J., concurring) (agreeing with conclusion in Opinion Announcing Judgment of Court that amendment to death penalty statute allowing victim impact testimony is constitutional, writing separately on issue of jurisprudence not implicated here). Importantly, the *Means* Court explained that:

> [V]ictim impact testimony is just one of the relevant factors the jury may consider when weighing the aggravating and mitigating circumstances it has found during its deliberations on sentence. The addition of victim impact testimony into the deliberative process is not such an arbitrary factor that its inclusion would preclude meaningful appellate re-

stances, any evidence presented about the victim and about the impact of the murder on the victim's family.").

view. We are satisfied that the trial judges of this Commonwealth can adequately prevent unduly prejudicial and inflammatory information from entering into the jury's deliberations in the guise of victim impact testimony.

773 A.2d at 154; *accord Eichinger*, 915 A.2d at 1139–40 (majority decision); *see also* 42 Pa.C.S. § 9711(a)(2) and (c)(2). Furthermore, a trial court is presumed to have properly exercised its discretion in harnessing victim impact testimony, and the burden to prove otherwise is substantial. *Eichinger*, 915 A.2d at 1140.

Here, with regard to appellant's argument that the victim impact testimony was excessive, we agree with the trial court that appellant waived this claim because he never objected on this ground at the sentencing hearing. Indeed, after reviewing the record, we find that the only objection appellant made at the hearing regarding the whole of the victim impact testimony related to the testimony's relevance in proving aggravating factors. To the extent that this broad objection preserves the foundation of appellant's equally broad constitutional claim, we note that his claim involves a full panoply of arguments we have considered and rejected in prior decisions. *See, e.g., Means*, 773 A.2d at 154 (rejecting argument that jury is not given proper direction in how to weigh victim impact testimony); *Eichinger*, 915 A.2d at 1139 (rejecting argument that testimony amounts to impermissible "non-statutory" aggravating factor); *Commonwealth v. Williams*, 578 Pa. 504, 854 A.2d 440, 446 (2004) (rejecting arguments that testimony unconstitutionally focused jury on victim's life and amounted to "super aggravating factor"); *see also* Appellant's Brief at 57, 60–61. Regarding the jury's weighing of this testimony, we also note that the trial court twice instructed the jury in a fashion similar to that suggested in *Means* (*see* N.T., 5/10/11, at 197–99; N.T., 5/17/11, at 204–06), and that we have reaffirmed the propriety of that instruction since then. *See Commonwealth v. Taylor*, 583 Pa. 170, 876 A.2d 916, 934 (2005). Because appellant provides us no new theory upon which we should disregard our precedent that victim impact

testimony is constitutional, and because *Payne* remains the law of the land on the federal question, his claim fails.

## B. Admissibility

Next, appellant claims that the trial court abused its discretion by admitting into evidence certain testimony that appellant believes was outside the scope of permissible victim impact testimony. The background for this claim is as follows. The proposed victim impact evidence was reviewed outside of the presence of the jury. The substance of each witness's testimony was set forth in writing, and the trial court passed upon the specific objections raised by appellant. The witnesses then testified.

Appellant now alleges error in allowing the following statements: Luther Marsh, Alvin Marsh's brother, thanked Mr. Zernhelt for his heroism, N.T., 5/10/11, at 206–07; Christopher Stettler, Merhi's first cousin, claimed that he "will be forever haunted by the last moments of [his] family and their heroic neighbor, Mr. Zernhelt," *id.* at 174–76; Jamie Zernhelt, Mr. Zernhelt's daughter, said that her father ran into Merhi's house to help a neighbor in need, id. at 233; Janet Zernhelt said that she found her husband, Steven, lying on the floor in a pool of blood, *id.* at 244; and Geraldine Dorwart, Merhi's grandmother, called the murders "brutal," said that Merhi suffered "terrible pain," referred to Merhi's 40th birthday party, explained that she still lives in Merhi's house with Merhi's children, and claimed that she is facing financial hardship because she no longer has health insurance as a result of the murders, and grandmothers do not receive compensation. *Id.* at 259–65.

Respecting each statement, appellant reiterates a combination of several claims. Appellant argues that the statements did not aid the jury in making its determination regarding aggravating and mitigating circumstances; they did not provide insight into the effect that the victims' deaths had on the witnesses; and they were made only to emotionalize the moment of the killings for the jury. Appellant also claims that even though he failed to object to Janet Zernhelt's testimony,

the statement he now objects to was not contained in the written statement agreed to before trial. Appellant argues that objecting to Janet Zernhelt's testimony in front of the jury would have prejudiced him because it would have either highlighted the statement for the jury, or caused the jury to feel that he was "berating the widow of one of his victims by preventing her testimony." Appellant's Brief at 67. Appellant also makes a specific challenge to the mention of Merhi's birthday, claiming that it violated an agreement with the Commonwealth not to mention that Merhi's birthday would have been on the first day of trial.

The Commonwealth responds that both parties and the trial court engaged in a line-by-line review, on the record and without the jury present, of the proposed victim impact testimony, and that the court evaluated each of appellant's specific objections. The Commonwealth responds that appellant cites no case law to support his assertions, and that all of these statements, in one way or another, speak to the impact that the deaths had on the victims' survivors. The trial court concluded that there was no abuse of discretion, and that with respect to the statements by Christopher Stettler and Janet Zernhelt, appellant waived his claims by failing to object at trial or during the review of the pre-written statements. The court also assessed that any error was harmless.

Again, we note that our review in this area is deferential to the trial court's discretion. *Eichinger*, 915 A.2d at 1139–40. When a witness's statement is "an individualized and subjective commentary on the consequences of the murder," it is proper victim impact testimony. *Commonwealth v. Jordan*, 619 Pa. 513, 65 A.3d 318, 332–33 (2013) (quoting *Commonwealth v. Singley*, 582 Pa. 5, 868 A.2d 403, 415 (2005)). Moreover, "[a]lthough the evidence that is the subject of Section 9711(a)(2) has been generally labeled 'victim impact' evidence, it is important to note that the text of the statute explicitly refers twice to two types of evidence or information: 'concerning [1] the victim and [2] the impact that the death of the victim has had on the family of the victim.'" *Flor*, 998 A.2d at 634 (quoting 42 Pa.C.S. § 9711(a)(2)). We

also recognize that impact statements do not exist in a vacuum, but rather, of necessity they may be made in the context of the witness's relationship to the victim. *See Singley*, 868 A.2d at 415.

 First, regarding the statement of Christopher Stettler, we note that his testimony before the jury omitted the language that appellant objected to during the initial review, and therefore appellant's current objection is moot.[25] Furthermore, our review of the record confirms that appellant's claim regarding Janet Zernhelt's testimony is waived pursuant to Pennsylvania Rule of Appellate Procedure 302 for failure to object below. Of course, it would have been salutary if the witnesses had not deviated from the approved statements, but it was still incumbent upon appellant to object and to give the trial court the option of a corrective measure. *See Commonwealth v. May*, 587 Pa. 184, 898 A.2d 559, 587 (2006) (in direct capital appeal, challenge to admissibility of evidence at penalty hearing was waived because defense failed to object). Appellant provides no legal basis to overlook his waiver because of the prejudice he claims would have resulted at trial if he objected; moreover, the objection could be made at sidebar. Whether a mistrial or lesser remedy is warranted is a determination for the trial judge.

 Lastly, after reviewing the record concerning the remaining statements to which appellant objected, and placing them in the full context of each witness's testimony, it is clear that the statements were personalized accounts of either the victim, or the victim's death's impact on the witness. Thus, we see no abuse of discretion in the trial court finding that all the above accounts challenged by appellant constituted proper victim impact testimony.

25. Regarding Mr. Stettler's statement, appellant's quoted language comes from the written version; in front of the jury, Stettler revised the language of his statement and said "... will forever remember the last moments of my family and neighbor, Steven Zernhelt ..."; likewise, Ms. Dorwart did not call the murders "brutal." N.T., 5/10/11, at 213, 259.

The statements by Luther Marsh and Jamie Zernhelt related to Mr. Zernhelt's heroism and reflected the esteem in which they personally held him. Likewise, Dorwart's statements were personalized statements of the impact her daughter's death has had on her; and a statement that she would not be able to celebrate Merhi's 40th birthday did not divulge that Merhi's birthday would have been on the first day of trial. We note again that the trial court twice instructed the jury to weigh this evidence with caution so as to not let an emotional response limit its rational inquiry into the culpability of appellant. *See, e.g.*, N.T., 5/17/10, at 205. Accordingly, we see no abuse of discretion in the trial court's finding that none of these alleged errors afford appellant any relief.

## VI. Jury Instructions

Appellant next claims that the trial court abused its discretion in denying two of his requested jury instructions. Specifically, appellant claims that the trial court's charge was insufficient because it failed to instruct the jury that: (1) there is a presumption of life imprisonment in capital cases, and (2) a death sentence is never required. *See* N.T., 5/17/11, at 66–67, 70–71, 217–18.

### A. Presumption of Life Instruction

With regard to the presumption of life, appellant claims that our decisional law requires the following instruction:

There is a presumption of life imprisonment in this case. The Commonwealth bears a heavier burden to show aggravating factors beyond a reasonable doubt while factors in mitigation need only be proven by a mere preponderance of the evidence. Life has intrinsic value and should not be taken by the Commonwealth without good cause, proven to our highest standard, whereas life imprisonment remains our default punishment for capital cases.

"Appellant's Proposed Jury Instructions Death Penalty Hearing Supplementing the Standard Pattern Jury Instructions," 5/16/11, at ¶ 4. Appellant argues that this Court's decision in *Travaglia*, 467 A.2d at 300, acknowledged that Pennsylvania's

Sentencing Code creates a presumption in favor of life imprisonment based on its disparate treatment of aggravating and mitigating circumstances. Appellant further argues that this acknowledgment in *Travaglia* was reinforced by the Court again in *Eichinger*, 915 A.2d at 1137, and *Commonwealth v. Spotz*, 610 Pa. 17, 18 A.3d 244, 298 (2011). Appellant concludes that by openly acknowledging an otherwise tacit presumption in favor of life imprisonment, these decisions require trial courts to explain this presumption to juries.

The Commonwealth responds that *Eichinger* and *Spotz* explicitly stated that the words "presumption of life" were not required in a penalty phase jury instruction. The Commonwealth argues that this is the end of the inquiry, noting that even appellant concedes that the Court's pronouncement in *Spotz* is contrary to his argument. The trial court agreed with the Commonwealth and added that it properly explained to the jury "the deliberately disparate treatment of the aggravating and mitigating circumstances and their applicable standards of proof, and ... that life in prison was the appropriate sentence unless the Commonwealth met its high burden." Trial Ct. Op. at 89.

 "Our standard of review for penalty phase jury instructions is the same as that which guides us in reviewing a jury charge during the guilt phase of trial. In reviewing a challenge to a jury instruction the entire charge is considered, not merely discrete portions thereof. The trial court is free to use its own expressions as long as the concepts at issue are clearly and accurately presented to the jury." *Eichinger*, 915 A.2d at 1138 (citing *Commonwealth v. Stokes*, 532 Pa. 242, 615 A.2d 704, 708 (1992)). This Court in *Travaglia* discussed the overall death penalty scheme and observed that a "presumption of life" operates in the capital sentencing statute by virtue of the fact "that the prosecution is limited to specified aggravating circumstances which must be proven beyond a reasonable doubt, while a defendant is permitted great latitude in demonstrating mitigating circumstances, and then by the less-

er preponderance of evidence standard." 467 A.2d at 300–01.[26] In *Eichinger* and *Spotz,* the Court addressed whether this presumption in the structure of the statute afforded a capital defendant a right to a specific jury charge. The Court in *Eichinger* made clear that:

An explanation of the deliberately disparate treatment of the aggravating and mitigating circumstances under the applicable standards of proof and a clear indication that life in prison is the sentence unless the Commonwealth meets its high burden is sufficient to convey [to the jury] the fact that life is presumed.

915 A.2d at 1138. In *Spotz,* the Court reaffirmed that "consistent with this Court's policy to give trial courts latitude and discretion in the phrasing of jury instructions, we held [in *Eichinger* ] that the words 'presumption of life' were not explicitly required in penalty phase instructions." *Spotz,* 18 A.3d at 298; *accord Commonwealth v. Lesko,* 609 Pa. 128, 15 A.3d 345, 404–05 (2011). It is clear that appellant cites these cases not for the rule they actually announce, but for the rule appellant suggests should be made the law. The trial court was not obliged to issue the charge that appellant proposed.

Moreover, the charge actually given was appropriate. The court instructed the jury as follows:

When voting on general findings, you are to regard a particular aggravating circumstance as present only if you all agree that it is present. On the other hand, each of you is free to regard a particular mitigating circumstance as present despite what other jurors may believe. This different treatment of aggravating and mitigating circumstances is one of the law's safety guards against unjust death sentences. It gives the defendant full benefits of any

26. The underlying issue in *Travaglia* had nothing to do with instructing the jury, and the Court did not elaborate on what a "presumption of life" entailed. In *Travaglia,* the court concluded that a presumption of innocence did not protect appellant in the sentencing phase of trial, and remarked that the only available presumption, "if it can be called such," is a "presumption of life." 467 A.2d at 300–01 (concluding that presumption of life did not support appellant's argument to exclude prosecutor's comment regarding appellant's lack of remorse).

mitigating circumstances. It is closely related to the burden of proof requirements. Remember, the Commonwealth has to prove any evidence beyond a reasonable doubt, while the defendant only has to prove any mitigating circumstance by a preponderance of the evidence.

\* \* \* \*

Finally, I want to tell you that in making the decision whether or not to impose the death penalty upon [appellant] [it] is entirely proper for you to consider sympathy or mercy as a reason to impose a sentence of life imprisonment. The sympathy or mercy which you may wish to show to Mr. Ballard must be found upon evidence any one or more of you find to be a mitigating circumstance.

N.T., 5/17/11, at 208–09, 220. The charge tracks the statute, which is the governing law. It is apparent that the trial court adequately charged the jury with regard to the weighing of aggravating and mitigating factors in a fashion that properly conveyed the differing levels of proof and the different requirements respecting juror unanimity. Appellant's claim regarding this jury charge is meritless.

### B. Death Sentence Never Required

Appellant also proposed adding the following language to the portion of the standard jury instruction that explains the aggravating and mitigating factors: "A jury is never required to impose a death sentence and a sentence of death cannot be imposed except by unanimous vote."[27] Appellant relies upon *United States v. Hammer,* 404 F.Supp.2d 676, 686 (M.D.Pa. 2005) and *Jones v. United States,* 527 U.S. 373, 384, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) (allowing instruction reading ". . . regardless of your findings with respect to aggravating and mitigating factors, you are never required to recommend a death sentence."). Appellant argues that failing to provide this instruction violates his due process rights, and his right to be free from cruel and unusual punishment, under both the Pennsylvania Constitution and the U.S. Constitution, and ap-

---

**27.** "Appellant's Proposed Jury Instructions Death Penalty Hearing Supplementing the Standard Pattern Jury Instructions," at ¶ 11.

pellant further contends that mercy may be considered by the jury at any point as a reason to impose a sentence less than death.

The Commonwealth concedes that *Hammer* and *Jones* allowed language similar to appellant's proposed instruction, but saliently notes that those cases do not establish a constitutional rule requiring the states to include such language. Further, the Commonwealth notes that 42 Pa.C.S. § 9711(c)(iv) does, in fact, require that the jury render a verdict of death under certain circumstances, and to instruct otherwise would be contrary to the law of Pennsylvania. The trial court agreed with the Commonwealth and explained that *Hammer* and *Jones* are irrelevant because they involved the federal death penalty sentencing scheme, which lacks the mandatory language found in Section 9711(c)(iv).

■ Again, the trial court has wide latitude in phrasing its jury instructions. *Eichinger,* 915 A.2d at 1138. There is no relevant Pennsylvania case law addressing this particular issue. However, a plain reading of the Sentencing Code reveals that the statutory mechanism for imposing the death penalty in Pennsylvania indeed requires the imposition of death under two circumstances: (1) when the jury finds at least one aggravating circumstance and no mitigating circumstance, or (2) when the jury finds at least one statutory aggravating circumstance, and further finds that it outweighs any mitigating circumstances. 42 Pa.C.S. § 9711(c)(1)(iv); *see also Commonwealth v. Morales,* 549 Pa. 400, 701 A.2d 516, 523 (1997) ("[A]s long as there exists one aggravating circumstance and no mitigating circumstances, as is the case here, the death penalty is required as a matter of law."). The provisions exist to reduce arbitrariness in the application of the most severe penalty. Furthermore, the U.S. Supreme Court has expressly found that this mechanism is constitutional. *See, e.g., Blystone v. Pennsylvania,* 494 U.S. 299, 308–09, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990). Therefore, an instruction to the jury that a sentence of death is never mandatory would be inaccu-

rate as a matter of law, and appellant's claim must fail.[28]

## VII. Passion, Prejudice, and Arbitrariness ("PPA") Review[29]

The death penalty statute requires this Court to conduct an independent penalty review pursuant to 42 Pa.C.S. § 9711(h)(3). Section 9711(h)(3) provides that "[t]he Supreme Court shall affirm the sentence of death unless it determines that: (i) the sentence of death was the product of passion, prejudice or any other arbitrary factor; or (ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d)." *See Sanchez*, 36 A.3d at 72. Invoking this provision, appellant next claims that his sentences were the product of passion, prejudice, or some other arbitrary factor and therefore he is entitled to a new sentencing hearing. Appellant argues that he established by a preponderance of the evidence up to fifteen mitigating factors, including, *inter alia*, that he suffers from significant brain damage. Appellant believes that these factors are more than sufficient to prove a statutory mitigating circumstance under 42 Pa.C.S. § 9711(e)(8) ("Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense"). According to appellant, in light of the amount of "un-rebutted" mitigating evidence he produced, the jury's failure to find a mitigating circumstance under the catchall provision is evidence that "the jury did not objectively and dispassionately review the evidence." Appellant alleges that the jury's death verdicts were "based on the brutality of the crime and financial and emotional hardship"

28. In light of appellant's arguments, *infra*, that blur the distinction between mitigating circumstances enumerated in Section 9711(e), and "other evidence of mitigation" mentioned under the catchall mitigating circumstance, at subsection 9711(e)(8), we clarify here that were a jury to find a mitigating circumstance as the result of a mercy instruction, it would fall under the statutory catchall circumstance.

29. In his brief, appellant lists two separately numbered issues regarding PPA review. *See* Appellant's Brief at 10 (Issues 7 & 8). In Issue 7, appellant claims that he proved, but the jury failed to consider, brain damage as a mitigating factor. In Issue 8, appellant makes the same argument with respect to fifteen other mitigating factors, of which brain damage is one. Therefore, we have consolidated these issues.

suffered by the victims' families. Appellant's Brief at 72. Appellant goes so far as to assert that if at least one lone juror had found the catchall mitigating circumstance, and that juror still found that the mitigating circumstance failed to outweigh the aggravating circumstances, the initial finding would be sufficient to prove that the jury properly weighed appellant's mitigation evidence; the fact that no juror made such a finding, appellant claims, proves that the jury failed to properly deliberate. *Id.*

The Commonwealth responds that a capital jury is not required to find any mitigating circumstances presented by the defense and that this is a natural result of a jury's discretion as fact finder to believe all, part, or none of the evidence presented to it. The Commonwealth argues that it presented undisputed evidence of two aggravating circumstances (a prior murder in 1992, and multiple murders in the instant case), and although the Commonwealth did not offer its own rebuttal evidence on mitigation, it argues that its thorough cross-examination of appellant's witnesses provided a plausible basis for the jury not to credit appellant's evidence. For instance, the Commonwealth points to the cross-examination of forensic psychologist Dr. Gerald Cooke in which Dr. Cooke admitted that appellant's alleged brain injury would not prevent him from forming the intent to kill or determining right from wrong. N.T., 5/13/11, at 258–60. The Commonwealth also argues that it is exclusively the jury's duty to weigh the evidence. The trial court agreed with the Commonwealth. The court added that there is no indication that the jury failed to follow the court's instructions with regard to the parties' respective burdens of proof or how the jury must weigh and evaluate the evidence. Trial Ct. Op. at 96.

Although appellant devotes seventeen pages of his brief to recounting the evidence that he submitted in mitigation, he cites but three cases, none of which support his legal claim, and one of which he concedes suggests that his claim must fail. *See* Appellant's Brief at 68–85. Specifically, appellant cites *Commonwealth v. Walter*, 600 Pa. 392, 966 A.2d 560

(2009), and we find it instructive here.[30] In *Walter*, the Court
held that "[a] capital jury is not required to find a mitigating
factor presented by a defendant, even if the Commonwealth
fails to present evidence rebutting the existence of that fac-
tor." *Id.* at 568. Nonetheless, appellant urges us to disre-
gard the teaching of *Walter* and to set aside the jury's
conclusion in light of appellant's "unrebutted" evidence re-
garding: (1) head trauma in his youth; (2) physical abuse; (3)
domestic violence; (4) poverty; (5) parental neglect; (6) famil-
ial dysfunction; (7) sexual abuse; (8) abandonment; (9) family
alcohol history; (10) adult life in prison; (11) acceptance of
responsibility for his crimes by pleading guilty; (12) amenabil-
ity to life imprisonment; (13) prison institutional failure; (14)
traumatic brain injury; and (15) intoxication at time of the
offense. Appellant's Brief at 73 n.27.

Although appellant has developed a substantial account of
the factual record for our review, he has failed to develop a
legal argument that would warrant us in setting aside the
jury's finding. Evidence concerning the catchall mitigator
tends to be subjective, and the value of that evidence no doubt
varies depending upon the context. In this case, appellant
committed not one murder, but four; and he had a prior
murder conviction. Although the Court is not privy to the
jury's deliberation, the value of his catchall mitigation evi-
dence logically may have been discounted by the jury given
the enormity of his crimes. Irrespective of why the jury
determined not to find this particular mitigating circumstance,
the point remains that the determination was reposed with the
fact finder. *See Reyes*, discussed *infra*. We cannot set it
aside, based upon speculation that the jury did not do its duty.

### VIII. Weight of the Evidence

Appellant relatedly claims that the sentence of death was
against the weight of the evidence. Appellant concedes that

**30.** The other two cases are *Commonwealth v. May*, 587 Pa. 184, 898
A.2d 559, 573–74 (2006) (noting importance of juries being made aware
of defendant's childhood when deciding whether to impose death
penalty) and *Commonwealth v. Dick*, 602 Pa. 180, 978 A.2d 956 (2009)
(quoting Section 9711(h) regarding PPA review). Neither case is help-
ful here.

Rule 607 of the Pennsylvania Rules of Criminal Procedure, which governs challenges to the weight of the evidence, does not provide for a weight of the evidence challenge to a death sentence. However, appellant asserts that this Court's statutory obligation under the Sentencing Code to review a death sentence for passion, prejudice, or other arbitrary factors ("PPA"),[31] is akin to an independent review of the weight of the evidence. To support his theory, appellant contends that PPA review under Section 9711(h)(3) shares the same implied analytical standard as that used in a challenge to the weight of the evidence, *i.e.*, whether, based on the facts, the verdict "shocks one's sense of justice." Appellant argues that this Court "must review the evidence and determine if an objective weighing of the facts would lead" the Court to conclude whether passion or prejudice played a role in the jury's decision. According to appellant, "there is simply no other way to determine if a death sentence was the product of passion or prejudice except by re-weighing the evidence." Appellant's Brief at 86–87.[32]

The Commonwealth argues that appellant pled guilty to murdering four individuals, and that the jury considered all relevant evidence before it sentenced appellant. The Commonwealth contends that the PPA statutory language does not create an obligation for this Court to re-weigh the evidence. The trial court agreed, finding that appellant's claim fails given that our Court rejected precisely such an argument in *Commonwealth v. Reyes*, 600 Pa. 45, 963 A.2d 436 (2009), *cert. denied*, 558 U.S. 850, 130 S.Ct. 127, 175 L.Ed.2d 82 (2009).

We find *Reyes* indeed is controlling. In *Reyes*, the Court explained that the power to vacate a death sentence is circumscribed by Section 9711(h)(3) of the Sentencing Code. "This restriction on our authority has caused this Court to

**31.** 42 Pa.C.S. § 9711(h)(3)(ii).

**32.** To support his argument, appellant states that he "incorporated by reference" the facts set forth in his other claim involving PPA review, and concluded that the jury's decision was against the weight of the evidence. We decline to independently develop appellant's argument. *See Walter*, 966 A.2d at 567 (failure to develop argument on appeal is fatal to claim).

reiterate many times that it is exclusively the function of the jury in the first instance to decide whether aggravating and mitigating circumstances exist and then whether the aggravating circumstances outweigh any mitigating circumstances." Because the weighing process is exclusively a question for the fact-finder, the Supreme Court "may not reverse a death penalty on weight of the evidence grounds." 963 A.2d at 441–42.

*Reyes* made clear that claims regarding weight of the evidence are not available to challenge a death sentence. Appellant offers no basis in law or logic to employ PPA review as a mandate to re-weigh the evidence introduced at the penalty phase. Indeed, because we are an appellate court, we are not at all suited to the task of weighing evidence. We do not have the ability to observe the demeanor of witnesses; that is why the review of traditional weight claims is a deferential one, limited to determining if the trial court abused its discretion. *Sanchez*, 36 A.3d at 39.

## IX. Verdict Slip

 Finally, appellant claims that the trial court erred in failing to individually list on the verdict slip all of the mitigating factors for which he presented evidence under the catchall mitigating circumstance, 42 Pa.C.S. § 9711(e)(8) ("Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense."). Appellant asserts that the trial court's reiteration of the non-statutory mitigating factors he proffered during the charge to the jury was insufficient, and that the non-statutory factors should have been individually listed on the verdict slip. Appellant concedes that our Court rejected precisely this claim in *Eichinger, supra,* but submits that *Eichinger* was wrongly decided. He further argues that denying his request amounts to a constitutional violation under the U.S. Supreme Court's decisions in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). Appellant's argument is threefold. First, according to appellant, a jury is unable to

"give consideration and effect" to all mitigating factors if it is not given a written list. Second, appellant contends that listing the aggravating circumstances individually, without doing the same for the mitigating factors, violates due process because it "unnecessarily benefits the Commonwealth" by denying "an equal playing field." Appellant's Brief at 89–90. Lastly, appellant invokes Criminal Rule 807(a)(2) which states that, "the judge shall meet with counsel and determine those aggravating and mitigating circumstances of which there is some evidence. The judge shall then set forth those circumstances on the sentencing verdict slip using the language provided by law." Pa.R.Crim.P. 807(a)(2).[33] Appellant contends that "those circumstances" referred to in the Rule include both statutory and non-statutory mitigating circumstances.

The Commonwealth responds that the Court correctly interpreted *Lockett* and *Eddings* when it reached its decision in *Eichinger*, and that the trial court is only required to "furnish the jury with a jury sentencing verdict slip in the form provided by Rule 808." Appellee's Brief at 46 (quoting Pa. R.Crim.P. 807(a)(1)). The trial court agreed with the Commonwealth, noting that it strictly followed the verdict slip form in Rule 808 in preparing the verdict slip in this case and that it met the requirements under *Eichinger* by "thoroughly, accurately, and appropriately instruct[ing] the jury concerning all of the mitigating circumstances introduced by appellant that were supported by the evidence." Trial Ct. Op. at 109.

The Court stated in *Eichinger*, and it bears repeating here, that:

[T]he holding of *Lockett* does not require that the verdict slip in capital cases list each non-statutory mitigating factor individually. *Lockett* was a plurality opinion. The viewpoint expressed in *Lockett* ripened into a holding of the United States Supreme Court in *Eddings v. Oklahoma*, 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). *See Saffle v. Parks*, 494 U.S. 484, 490, 110 S.Ct. 1257, 108 L.Ed.2d 415

**33.** Appellant mistakenly references Pa.R.Crim.P. 807(b). *See* Appellant's Brief at 90.

(1990). We have held that *Lockett* and *Eddings* stand only for the proposition that a state may not bar relevant mitigating evidence from being presented and considered during the penalty phase of a capital trial. *Commonwealth v. King*, 554 Pa. 331, 721 A.2d 763, 776 (Pa.1998). Our statutory framework concerning the death penalty allows a defendant to present to the jury "any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." 42 Pa.C.S. § 9711(e)(8). We have specifically held that we believe that the presentation of that mitigating factor to the jury as a part of the judge's charge satisfies the requirements of *Lockett*. *Commonwealth v. Lesko*, 509 Pa. 67, 501 A.2d 200, 207 (Pa.1985). *Eichinger*, 915 A.2d at 1146.

Here, appellant advances essentially the same arguments that the Court addressed and rejected in *Eichinger*. *See id.* at 1145–46 (describing appellant's argument as meaning that: "[l]umping these individual mitigating factors into one category on the verdict slip indicates to the jury that the non-statutory mitigating factors do not carry equal weight next to the statutory factors."). Appellant contends that *Eichinger* was wrongly decided, but offers no new analysis on the subject. There is an obvious difference between rearguing relevant mitigation to be placed before the jury, and the manner of its consideration, as in the statute. Not all "factors" amount to independent statutory "circumstances." On the argument presented, we are not inclined to revisit *Eichinger*.

Turning to appellant's reading of Criminal Rule 807(a)(2), it is unfounded. Although *Eichinger* did not address this Rule directly, it is clear by that decision and others that the Court has defined aggravating and mitigating **circumstances** as those enumerated by statute. *See also Reyes*, 963 A.2d at 440 n. 7 ("Appellant mistakenly refers to these factors as constituting ten mitigating circumstances. This is incorrect because the 'factors' were not presented to the jury as mitigating circumstances but rather as factors the jury should consider in deciding whether to find the [single] 'catch-

all' mitigating circumstance set forth at 42 Pa.C.S. § 9711(e)(8)."). This is also consistent with the statutory language of Section 9711(e)(8): what appellant refers to as mitigating circumstances are merely "any other evidence of mitigation" in support of a single statutory mitigating circumstance.

Here, the trial court instructed the jury as to the catchall mitigating circumstance as follows:

The final mitigating circumstance is any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense. This mitigating circumstance is what we call the catchall circumstance. This catchall circumstance allows you to consider anything else that you have heard at the penalty phase concerning any of the circumstances of the offense or about the defendant's background or character as a mitigating circumstance if you choose to do that.

N.T., 5/17/11, at 203. The trial court then identified for the jury all fifteen of the **factors** for which appellant submitted evidence. *See id.* at 203–04. This charge is substantially the same as the charge we approved in *Eichinger*, and meets the constitutional restrictions established by *Lockett* and *Eddings*. The charge incorporated each mitigating factor presented by appellant, allowed the jury to consider any other mitigating factors it found by a preponderance of the evidence, and then instructed the jury to carefully weigh the seriousness and importance of the aggravating and mitigating circumstances. Appellant fails to explain why we should adopt an illogical, and perhaps misleading, requirement that we have previously rejected, and so his claim must fail.

## X. Statutory Review

As noted above, this Court is required to affirm the death sentence unless we find that: the sentence was the product of passion, prejudice, or any other arbitrary factor; or the evidence fails to support the finding of at least one aggravating circumstance. *See* 42 Pa.C.S. § 9711(h)(3). After a thorough review, we conclude that the four sentences of

death appellant received were not the product of passion, prejudice, or any other arbitrary factor; rather, they were supported by overwhelming evidence, detailed above, that appellant killed four individuals: Denise Merhi, Dennis Marsh, Alvin Marsh, and Mr. Zernhelt. Moreover, the evidence supported the jury's finding of an aggravating circumstance under Section 9711(d)(10) (simultaneous murders) with respect to each victim; and the Commonwealth introduced appellant's 1992 conviction for third-degree murder, which supports the jury's finding of an aggravating circumstance under Section 9711(d)(11) (previous murder conviction) with respect to Ms. Merhi, Alvin Marsh, and Mr. Zernhelt. There is no basis upon which to upset the death verdicts.

## XI. Conclusion

For these reasons, appellant's judgment of sentence is affirmed.[34]

Justices SAYLOR, EAKIN, BAER, McCAFFERY and STEVENS join the opinion.

Justice SAYLOR files a concurring opinion.

Justice TODD files a concurring opinion.

Justice SAYLOR, concurring.

I join the majority opinion, subject to the reservation that I have some difficulty with our continuing refusal to entertain an essential weight-of-the-evidence challenge relative to the imposition of a death sentence. *See* Majority Opinion, at 229, 80 A.3d at 412 (relying upon *Commonwealth v. Reyes*, 600 Pa. 45, 53–54, 963 A.2d 436, 441–42 (2009)). Although the majority explains that we are not well suited to the task of weighing evidence, *see id.*, I note that we do so regularly in terms of the application of the harmless error doctrine. *See, e.g., id.* at 205 n.19, 206–08, 208–11, 80 A.3d at 397 n.19, 398–99, 399–400.

---

**34.** The Prothonotary of the Supreme Court is directed to transmit a complete record of this case to the Governor in accordance with 42 Pa.C.S. § 9711(i).

We also "reweigh" in applying the prejudice component of claims of ineffective assistance of counsel. *Commonwealth v. Malloy,* 579 Pa. 425, 461, 856 A.2d 767, 789 (2004).

On review of Appellant's argument, I believe we may also assess the evidence—albeit in a manner which is highly deferential to findings by juries and trial courts—with the sole aim of screening against the possibility of a death verdict which would shock the conscience. In this regard, I would credit Appellant's position that such an inquiry is entirely consonant with our statutory obligation to review a death verdict for passion, prejudice, or any other arbitrary factor. *See* 42 Pa.C.S. § 9711(h)(3). Accordingly, while I previously joined the majority opinion in *Reyes,* I have come to believe that the decision is overstated, in the relevant regard.

Here, however, nothing in Appellant's presentation persuades me that his death sentences were not the product of a conscientious weighing process, undertaken by a jury of his peers, and justly impacted by the force of the aggravating circumstances.

Justice TODD, concurring.

I join the Majority Opinion in all but one respect. Among other challenges to the cross examination of Appellant's expert, Dr. Ruben Gur, Appellant contends the trial court abused its discretion in allowing questioning concerning the exclusion of Dr. Gur's testimony in *United States v. Montgomery,* 635 F.3d 1074 (8th Cir.2011), an unrelated federal prosecution. *See* Majority Opinion at 199–208, 80 A.3d at 394–98. I agree with Appellant that this questioning should not have been allowed. According to the majority, "the questions about *Montgomery,* the federal prosecution in which Dr. Gur's testimony was excluded, pushed the bounds of relevancy given the obvious complications involving factual distinctions, different evidentiary standards, and the dubious relevance of another court's discretionary rulings." *Id.* at 205 n.19, 80 A.3d at 397 n.19. Rather than allow this type of cross examination as "pushing the bounds of relevancy," I would disallow it, and find its admission to be an abuse of discretion. However, as I believe the trial court's error was harmless in this particular

236

case, as the majority acknowledges in the alternative, *see id.,* I would reject Appellant's claim on that basis, and therefore would nevertheless affirm Appellant's judgment of sentence.