J-A32012-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| JOSEPH THOMAS GAINER, | |
| Appellant | No. 1673 WDA 2014 |

Appeal from the Judgment of Sentence September 4, 2014
In the Court of Common Pleas of Allegheny  County
Criminal Division at No(s): CP-02-CR-0017534-2009

BEFORE:  SHOGAN, OTT, and STABILE, JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED JANUARY 25, 2016**

Appellant, Joseph Thomas Gainer, appeals from the judgment of sentence entered following his conviction of criminal homicide, robbery and criminal conspiracy.  We affirm.

The trial court summarized the procedural and factual history of this case as follows:

> [Appellant] was charged with Criminal Homicide,[1] Robbery,[2] Carrying a Firearm Without a License[3] and Criminal Conspiracy[4] in relations [sic] to events that occurred when he was 17 years old.  Prior to trial, the firearms charge was dismissed.  Following a jury trial held before [the trial court] from April 11-14, 2011, [Appellant] was convicted of Second-Degree Murder and all remaining charges.  On April 20, 2011, [Appellant] appeared before [the trial court] and was sentenced to a mandatory term of life imprisonment.  Timely Post-Sentence Motions were filed and were denied by operation of law on September 26, 2011. [Appellant] appealed, raising a Miller claim, among other issues.  [The trial court] conceded that the sentence was illegal and the Superior Court remanded the case

for re-sentencing. [Appellant] was re-sentenced on September 4, 2014 to a term of imprisonment of 35 years to life. Timely Post-Sentence Motions were filed and were denied on September [18], 2014. This appeal followed.[1]

> [1] 18 Pa.C.S.A. §2501(a)
> [2] 18 Pa.C.S.A. §3701(a)(1)-4 counts
> [3] 18 Pa.C.S.A. §6106(a)(1)
> [4] 18 Pa.C.S.A. §903(a)(1)

Briefly, the evidence presented that on the evening of October 16, 2009, Albert Bock was working as a bartender at the K & M Pub in Mt. Oliver. His girlfriend, Samantha Snelsire and his friends Paul Malloy and Michael Plish were hanging out at the bar while Bock worked. After closing the bar in the early morning hours of October 17, 2009, Bock and his friends left the bar and went to Bock's house at 310 Beltzhoover Avenue in the Beltzhoover section of the City of Pittsburgh, where they sat on the porch and talked. Inside the house were Bock's brother, Tony and Tony's son, DJ.

Bock and his friends were on the porch for a few minutes when [Appellant] and two other men came onto [the] porch and pointed guns at Bock and his friends. [Appellant] and the other two men went to each of the victims and forcibly took money, keys and cell phones out of their pockets. When [Appellant] determined that was not enough, he demanded that Bock bring him into the house so he could take more things. When Bock refused, saying that his young nephew was in the house, [Appellant] tried to enter the house on his own. He was stopped by Bock's dog who ran at him. [Appellant] put the gun to Bock's head and demanded that he tie up the dog and let him in the house. When Bock again refused, saying that his young nephew was inside the house, [Appellant] shot Bock in the head, killing him instantly.

[Appellant] and his friends fled the scene. However, [Appellant] returned to Bock's house at approximately 5:00 a.m. By that time, the police and crime scene technicians were

_____

[1] Appellant and the trial court complied with the requirements of Pa.R.A.P. 1925.

processing the crime scene. [Appellant] spoke briefly to the homicide detectives and told them he was going to his grandfather's house to get some stereo equipment. The Detectives took his contact information and also some pictures because they thought his behavior was odd. Later, they included [Appellant's] picture in a photo array, where he was identified by Snelsire, Malloy and Plish. [Appellant] was arrested and confessed to the crime.

Trial Court Opinion, 1/13/15, at 1-3.

Appellant presents the following issues for our review:

1. Whether the Trial Court erred making the determination not to suppress Appellant's statement and found that Appellant knowingly waived his *Miranda*[2] rights and made a voluntary confession where the police knew at the time of arrest for criminal homicide that Appellant was 17 years old when he asked for his parent and a lawyer?

2. Whether the Trial Court erred in finding that Appellant "opened the door" regarding the inventory list from the search that was conducted of Appellant's parents['] home such as to allow the Commonwealth to present rebuttal witness testimony indicating the presence of a gun when Appellant's mother on cross-examination by the prosecutor stated that she did not see a warrant and only "got a piece of paper that said what they were removing from my house"?

3. Whether the Appellant, as an indigent defendant, was prejudiced by the denial of the Trial Court to allow him to use the same sophisticated audio system consisting of Bluetooth headsets for each juror to play the Commonwealth's eyewitness taped statements when that equipment was used for the playing of his taped statement?

Appellant's Brief at 5.

_____

[2] ***Miranda v. Arizona***, 384 U.S. 436 (1966).

Appellant first argues that the trial court erred as a matter of law by failing to suppress Appellant's statement confessing to the murder. Appellant's Brief at 17. Appellant maintains that "[t]he evidence presented at the suppression hearing viewed in the light most favorable to the Commonwealth did not establish by a preponderance of the evidence that Appellant knowingly and intelligently waived his right to a parent/counsel and knowingly and intelligently confessed to the crime." *Id.*

The standard of review an appellate court applies when considering an order denying a suppression motion is well established. An appellate court may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. *Commonwealth v. Russo*, 934 A.2d 1199, 1203 (Pa. 2007). Where the record supports the factual findings of the trial court, the appellate court is bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. *Id*. However, it is also well settled that the appellate court is not bound by the suppression court's conclusions of law. *Id*.

> With respect to factual findings, we are mindful that it is the sole province of the suppression court to weigh the credibility of the witnesses. Further, the suppression court judge is entitled to believe all, part or none of the evidence presented. However, where the factual determinations made by the suppression court are not supported by the evidence, we may reject those findings. Only factual findings which are supported by the record are binding upon this [C]ourt.

*Commonwealth v. Caple*, 121 A.3d 511, 517 (Pa. Super. 2015). In addition, we are aware that questions of the admission and exclusion of evidence are within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. *Commonwealth v. Freidl*, 834 A.2d 638, 641 (Pa. Super. 2003).[3]

*Miranda* warnings are required where a suspect is subjected to custodial interrogation. *Commonwealth v. Ingram*, 814 A.2d 264, 271 (Pa. Super. 2002). Custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way" and is confined to interactions in which the "police should know that their words or actions are reasonably likely to elicit an incriminating response." *Miranda*, 384 U.S. at 444; *Ingram*, 814 A.2d at 271.

With regard to waiver of *Miranda* rights, this Court has explained:

> *Miranda* holds that "[t]he defendant may waive effectuation" of the rights conveyed in the warnings "provided the waiver is made voluntarily, knowingly and intelligently." The inquiry has two distinct dimensions. First the relinquishment of the right must have been voluntary in the sense that it was the product of

_____

[3] On October 30, 2013, our Supreme Court held that the scope of review of a suppression court's decision is limited to the evidence produced at the suppression hearing, and not the whole record. *In the Interest of L.J.*, 79 A.3d 1073, 1076 (Pa. 2013). That case does not apply here, however, because the ruling is prospective and was decided after this case had commenced. *Id.* at 1089 (stating that the ruling applies to "all litigation commenced Commonwealth-wide after the filing of this decision.").

a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that **Miranda** rights have been waived.

**In Re: T.B.,** 11 A.3d 500, 505-506 (Pa. Super. 2010).

Furthermore, this Court has stated the following in assessing whether

a **juvenile** knowingly waived his **Miranda** rights:

A determination of whether a juvenile knowingly waived his **Miranda** rights and made a voluntary confession is to be based on a consideration of the totality of the circumstances, including a consideration of the juvenile's age, experience, comprehension, and the presence or absence of an interested adult. In examining the totality of circumstances, we also consider: (1) the duration and means of an interrogation; (2) the defendant's physical and psychological state; (3) the conditions attendant to the detention; (4) the attitude of the interrogator; and (5) "any and all other factors that could drain a person's ability to withstand suggestion and coercion." "[W]e acknowledge that the *per se* requirement of the presence of an interested adult during a police interview of a juvenile is no longer required. Nevertheless, it remains one factor in determining the voluntariness of a juvenile's waiver of his **Miranda** rights."

**Commonwealth v. Knox**, 50 A.3d 732, 746-747 (Pa. Super. 2012)

(internal citations omitted).

A confession obtained during a custodial interrogation is admissible where the accused's right to remain silent and right to counsel have been explained and the accused has knowingly and voluntarily waived those rights. The test for determining the voluntariness of a confession and whether an accused knowingly waived his or her rights looks to the totality of the circumstances surrounding the giving of the confession. The Commonwealth

bears the burden of establishing whether a defendant knowingly and voluntarily waived his ***Miranda*** rights.

***Commonwealth v. Parker***, 847 A.2d 745, 748 (Pa. Super. 2004)

The trial court provided the following explanation for its ruling on this issue:

> At the time of his arrest, [Appellant] was 17 years and 10 months old. He had an extensive history with the juvenile justice system, including arrests for burglary, guns and auto theft. He was arrested in the presence of his mother and the arresting Detective, Detective James McGee, waited at [Appellant's] home with his mother until his stepfather arrived and he could explain the situation. Detective McGee told [Appellant's] mother and stepfather what the charges were and asked them to come to the homicide office. [Appellant's] interrogation was delayed for two and a half hours while waiting for his parents to arrive. When they did not arrive, Detective McGee spoke to [Appellant's] stepfather on the telephone and was advised that they were not coming. At that point, the Miranda rights waiver form was read and explained to [Appellant]. He signed the waiver form indicating he understood his rights and agreed to speak with the detectives. He did not request an attorney or his parents at any time.
>
> At the suppression hearing, [Appellant] stated that several detectives wearing suits stormed his porch with guns drawn, and, without speaking, threw him to the ground and took him away while his mother screamed. He claimed that the detectives told him he "wouldn't never come home" unless he said what they wanted, in which case he would get "juvenile life".
>
> At the conclusion of the suppression hearing, [the trial court] made findings of fact before ruling on the Motion. It stated:
>
>> THE COURT: As to the issue of the statement given by [Appellant], the issue of credibility will be resolved in favor of the Commonwealth.
>>
>> [Appellant] wishes for me to believe that he stated that he shot someone for juvenile life. I'm not sure

- 7 -

what that's about. But I found the statement of the officer to be consistent and clear, and therefore I will deny the motion to suppress. Your objection, [counsel], is noted for the record.

The totality of circumstances clearly supports [the trial court's] finding that [Appellant] knowingly, voluntarily and intelligently waived his Miranda rights before confessing to the crime. [Appellant] was just months away from his 18th birthday and had an extensive history in the juvenile justice system. His parents were advised of the charges and chose not to attend the interrogation. [Appellant] did not ask for his parents or a lawyer at any time. His testimony that he only confessed to the crime because the detectives told him he would get "juvenile life" is both confounding and incredible.

Trial Court Opinion, 1/13/15, at 3-5 (internal citations omitted).

Likewise, our review of the record indicates the totality of the facts support the trial court's decision to deny Appellant's motion to suppress. Appellant was seventeen years and ten months old at the time of his arrest and interview by the police. N.T., 4/11/11, at 18. Appellant had previous exposure to the legal system. As reflected by the "rap sheet" presented by the Commonwealth at the suppression hearing, Appellant had a criminal history consisting of seven previous arrests, for a variety of offenses, most of which were felonies. *Id.* at 38. Appellant did not display any trouble understanding the questions on the *Miranda* forms. *Id.* at 20-21. Appellant provided responses which Officer McGee wrote on the form. *Id.* at 20. Appellant placed his signature at the bottom of the form. *Id.* Appellant did not appear to be under the influence of any drugs or alcohol at the time. *Id.* at 21.

Regarding the lack of presence of Appellant's parents at the police station, the record reflects that Appellant's mother was notified by the police that Appellant was being arrested and would be interviewed. N.T., 4/11/11, at 15. Appellant's mother asked if she could call Appellant's stepfather, to advise him of the situation. *Id.* at 15-16. Officers permitted Appellant's mother to contact Appellant's stepfather, and Officer James McGee waited at Appellant's house until Appellant's stepfather arrived. *Id.* at 16. Officer McGee provided the information regarding where Appellant would be taken and advised Appellant's parents to come to the station. *Id.* at 16. Appellant's mother and stepfather indicated that they would be present at the police station during questioning. *Id.* at 29-31, 35. When Officer McGee arrived at the station and met with Appellant there, he indicated to Appellant that he believed that Appellant's parents were "on their way" and advised Appellant that they would wait to proceed with questioning until Appellant's parents arrived. *Id.* at 17. The police delayed questioning of Appellant due to their expectation that Appellant's parents were on their way to the station. *Id.* at 31, 33. After two-and-one-half hours had elapsed, Appellant's parents were contacted regarding their whereabouts and Officer McGee was then informed that Appellant's mother and stepfather would not be coming to the station. *Id.* at 17, 23, 33-34. After Appellant was informed that his mother and stepfather would not be coming, he responded "okay." *Id.* at 18. When asked if Appellant would speak to the police

without his mother or stepfather being there, Appellant indicated that he would. *Id.* at 19. During the course of the interview, Appellant never requested that an attorney, a parent, or other adult be present during questioning. *Id.* at 21-22. The interview of Appellant following issuance of the *Miranda* warnings lasted approximately three hours. *Id.* at 34.

In summary, Appellant was seventeen, had previous exposure to the legal system, was only briefly questioned by police, and understood the questioning and his rights. Officers made significant effort to inform Appellant's parents of the procedure involving Appellant and to enable Appellant's parents to be present during questioning. Despite being informed of his right to such, Appellant did not request that an attorney or his parents be present during questioning. Consequently, we conclude that the trial court did not err in denying Appellant's motion to suppress his statement to police.

Appellant next argues that the trial court erred in allowing the Commonwealth to introduce impeachment testimony on a collateral matter. Appellant's Brief at 23. Specifically, Appellant asserts that the trial court erred in allowing the Commonwealth to present testimony in rebuttal to Appellant's mother's testimony regarding items found in and removed from Appellant's home pursuant to the search warrant. *Id. at* 23. Appellant's mother testified that only letters and mail had been taken from Appellant's room, and such was indicated on an inventory sheet. *Id.* at 24. The

Commonwealth presented testimony that a large caliber handgun was also taken out of the house pursuant to the search and as such, was indicated on the inventory sheet. *Id.* at 25. Additionally, Appellant argues that his mother did not have personal knowledge of the inventory because Appellant's father, and not his mother, received the inventory receipt. *Id.* at 26. Appellant maintains that he was severely prejudiced by admission of the rebuttal testimony regarding the handgun, and accordingly, should be granted a new trial. *Id.* at 27-28.

Our Supreme Court has provided the following guidance in addressing admission of rebuttal testimony:

> It is clear that a defendant may present any admissible evidence relevant to any mitigating circumstance, including any evidence regarding the character and record of the defendant ... [but] the defendant is not entitled to present, without challenge or rebuttal by the Commonwealth, false or misleading evidence or to create a false impression of his character or record. Furthermore, "the admission of rebuttal testimony is within the sound discretion of the trial court," and the appropriate scope of rebuttal evidence is defined by the evidence that it is intended to rebut. Where the evidence proposed goes to the impeachment of the testimony of his opponent's witnesses, it is admissible as a matter of right. Rebuttal is proper where facts discrediting the proponent's witnesses have been offered.

*Commonwealth v. Ballard*, 80 A.3d 380, 401-402 (Pa. 2013) (internal citations and quotation marks omitted).

Appellant's mother, Starlet Lellock, testified at trial and during cross-examination admitted to receiving an inventory of the items removed from her home during the search. N.T., 4/14/11, at 389-390. On re-direct, she

- 11 -

provided the following testimony regarding the items removed from her home and listed on the inventory:

> [Appellant's counsel]: And the form that you referred to, the inventory sheet, what was on there?
>
> [Ms. Lellock]: The first thing that it had, they had taken letters from my son's room, like mail, and I believe that's all that was on there, the first-yeah.

*Id.* at 392-393.

After the defense rested, the Commonwealth sought to introduce the testimony of Detective Scott Evans in rebuttal to Ms. Lellock's testimony. The following exchange took place between the Commonwealth, Appellant's counsel and the trial court:

> [The trial court]: [Commonwealth], rebuttal?
>
> [Commonwealth]: Yes, Your Honor. May we approach?
>
> (Thereupon, the following discussion was held at sidebar.)
>
> [Commonwealth]: Your Honor, I just didn't know if this was going to be – you know, the issue about - when Mrs. Lellock testified about what was in the inventory, taken out of her house, she said that's all.
>
> [Appellant's Counsel]: She did not say that's all.
>
> [Commonwealth]: She did.
>
> [The trial court]: She said letters, mail, that's it.
>
> [Appellant's counsel]: Then I asked her whether she read the whole thing. She said I didn't pay any attention to that.
>
> [The trial court]: But it's still opening the door.

- 12 -

[Commonwealth]: They took a large caliber handgun out of the house. And the detective who gave her a copy of the search warrant and gave the father a receipt is present to testify to all of that. Can he testify to that?

[The trial court]: Yes.

N.T., 11/14/11, at 413-414.

On the stand, Detective Scott Evans provided the following testimony:

[Commonwealth]: Now, did you author a report regarding the execution of the search and arrest warrants?

[Detective Evans]: Yes.

[Commonwealth]: Did you give a copy of the search warrant application to [Appellant's] mother, Starlet Lellock?

[Detective Evans]: Yes, I did.

[Commonwealth]: Okay. And is that documented in your report?

[Detective Evans]: Yes, it is.

[Commonwealth]: Okay. Did you give a copy of the receipt or the inventory to [Appellant's] father, George Lellock?

[Detective Evans]: Yes.

[Commonwealth]: And again, is that documented in your report?

[Detective Evans]: Yes, it is.

[Commonwealth]: The items that were authorized to search for, do they include any revolver type of firearm?

[Detective Evans]: Yes.

* * *

[Commonwealth]: And during your search of the residence, can you tell me what you found and what you listed on the inventory when you gave that to Starlet Lellock?

[Detective Evans]: Can I review it? I haven't - I know we got a gun out of the house.

[Commonwealth]: Okay. Specifically, there was a firearm that you took out of the house?

[Detective Evans]: Dessert [sic] Eagle. I believe it was a Dessert [sic] Eagle. I'm fairly certain.

[Commonwealth]: Okay. Is that a handgun?

[Detective Evans]: Yes, it is.

[Commonwealth]: Okay. Also indicia and that kind of thing?

[Detective Evans]: Yes.

[Commonwealth]: Okay. Would it be fair to say that the handgun that you took out of the house ultimately turned out not to be the weapon that was used to kill Albert Bock?

[Detective Evans]: That's correct.

N.T., 11/14/11, at 426-428.

The trial court provided the following analysis on this issue:

It is clear from the record . . . that Ms. Lellock opened the door to testimony about the gun removed from her home when she was asked on re-direct what was on the inventory sheet. By stating that the inventory sheet listed letters and mail and "that's all that was on there", Ms. Lellock clearly opened the door to testimony that a gun had been recovered from her residence, and so the Commonwealth was entitled to walk through it.

Trial Court Opinion, 1/13/15, at 9.

We agree. Ms. Lellock testified as to the contents of the inventory list.

As a result, she opened the door to questioning regarding the contents of

- 14 -

that inventory list. *See **Commonwealth v. Weiss***, 81 A.3d 767, 800 (Pa. 2013) (where appellant testified that he was not capable of hitting someone with a tire iron, appellant opened the door to rebuttal testimony of a witness who observed appellant hit an individual with a tire iron in a separate incident.). The trial court did not abuse its discretion in permitting the Commonwealth to offer testimony to rebut the false and misleading testimony presented by Ms. Lellock. ***Ballard***, 80 A.3d at 401-402. Accordingly, Appellant's second claim fails.

In his final claim, Appellant contends that he was prejudiced by the means of presentation of evidence at trial. Appellant's Brief at 30. Specifically, Appellant represents:

> The Commonwealth utilized a sophisticated audio system consisting of Bluetooth headsets for each juror to play the Appellant's taped statement in court. This system allows each juror to have individual control over the volume of their respective ear pieces thus, creating an ideal individual experience for listening to audio evidence. In sharp contrast, Appellant's counsel was forced to use a "boombox" to play the audio tape to the jury. The "boombox" had to be played very loudly so that all jurors could hear but in doing so the audio tape sounded garbled and lost its audibility.

*Id.* at 30-31. Appellant argues that, as an indigent defendant, he was unfairly prejudiced by presentment of the evidence in this manner, and as a result, should be granted a new trial. *Id.* at 36.

Our standard of review regarding evidentiary issues is well-settled:

> The admissibility of evidence is at the discretion of the trial court and only a showing of an abuse of that discretion, and resulting prejudice, constitutes reversible error. An abuse of discretion is

not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

***Commonwealth v. Glass***, 50 A.3d 720, 724-725 (Pa. Super. 2012) (internal citations and quotation marks omitted).

The trial court provided the following explanation in support of its denial of Appellant's request to replay the two witnesses' recorded statements on the Commonwealth's audio equipment:

At trial, [Appellant] introduced the recorded statements of eyewitnesses Michael Plish and Samantha Snelsire during their cross-examinations. The statements were played through defense counsel's computer and the jury was given transcripts of the recording so they could follow along. [The trial court] was able to hear the statements and confirmed with the jury that they were also able to hear the statements. Later in the trial, the Commonwealth introduced [Appellant's] confession and played the audio recording for the jury. The Commonwealth used audio equipment with headsets for the jurors. Immediately thereafter, [Appellant] began to argue [and asserted that it was not a fair trial if the witness's statement were not played on the same audio equipment].

[The trial court] does not own audio equipment used by the Commonwealth and cannot force the Commonwealth to allow [Appellant] to use its audio equipment. The audio recordings presented by defense counsel were audible to both [the trial court] and the jury and the jury was also given a transcript of the recordings so they were able to follow along with the audio. [Appellant] was not prejudiced in any way by the Commonwealth's refusal to share its audio equipment and [Appellant] was not discriminated against in any way due to his indigent status. This claim is meritless.

Trial Court Opinion, 1/13/15, at 9-10.

The record reflects that the audio statements made by Mr. Plish and Ms. Snelsire were played by the defense during cross-examination of each witness. N.T., 4/13/11, at 155, 211. As noted by the trial court, these statements were played by defense counsel through her laptop. *Id.* Of particular relevance is the fact that nobody objected to the clearness or audibility of these statements when they were played.[4] *Id.* 157-168, 211-227. Additionally, a transcript of the recorded statement was provided simultaneously with the audio statement for the jurors' benefit. *Id.* at 156-157, 326.

Subsequently, during the testimony of Detective James McGee, the Commonwealth played the audiotaped statement Appellant had given to homicide detectives following his arrest. N.T., 4/13/11, at 328. Based on the record, it appears that this audio equipment involved individual headsets for the jurors.[5] *Id.* at 325-328. At that point, defense counsel requested that she be permitted to use this particular equipment to replay Mr. Plish's and Ms. Snelshire's statements. *Id.* at 325-326. The trial judge denied this

_____

[4] We note that when Appellant's counsel initially began to play Ms. Snelsire's statement, the court and jury indicated they were having difficulty hearing the statement. The volume was adjusted and there was no subsequent indication that the court or the jury was having difficulty hearing the audio statement.

[5] The Commonwealth asserts that the equipment used to play Appellant's statement belonged to the Allegheny County Office of the District Attorney. Commonwealth's Brief at 34.

request on the basis that the statements when originally played were audible and that she did not want that evidence presented a second time. *Id.* at 325-326. The trial judge also noted that the jurors indicated that they could hear the statements. *Id.* at 326-327.

Accordingly, we cannot conclude that Appellant was prejudiced by the trial court's denial of his request to utilize the Commonwealth's audio equipment to replay the statements of witnesses Plish and Snelsire. As noted, there is no evidence that the jurors or court were unable to hear the statements, nor was there an objection made that the statements were inaudible. Transcripts of the statements were provided along with the statements, thus ensuring that the jurors understood the statements.

Moreover, the trial court did not abuse its discretion in refusing to allow Appellant to play the statements for the jury a second time. Replaying those statements may have resulted in undue emphasis being placed on that testimony and prejudice to the Commonwealth's case. *Commonwealth v. Taylor*, 596 A.2d 222, 223 (Pa. Super. 1991) (holding that the trial court did not abuse its discretion in disallowing the replaying of an audio statement based on its conclusion that replaying the statement would tend to emphasize the recorded statements over the other evidence admitted at trial and, therefore, would be improper.). Accordingly, Appellant's final claim lacks merit.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/25/2016