J-S16023-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LEVI THOMPSON | : | |
| | : | |
| Appellant | : | No. 882 EDA 2023 |

Appeal from the Judgment of Sentence Entered February 11, 2011
In the Court of Common Pleas of Philadelphia County
Criminal Division at No:  CP-51-CR-0008024-2009

BEFORE:   STABILE, J., LANE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STABILE, J.:                    **FILED OCTOBER 1, 2024**

Appellant, Levi Thompson, appeals the judgment of sentence entered by the Court of Common Pleas of Philadelphia County (trial court).  In 2011, Appellant was found guilty after a non-jury trial of first-degree murder and possession of an instrument of a crime.[1]  The trial court sentenced Appellant to a term of life without the possibility of parole.  He now argues on appeal that his murder conviction must be overturned because the evidence was legally insufficient, and the verdict was contrary to the weight of the evidence. We affirm.

The underlying facts of this case are as follows.  At about 9:00 p.m. on March 15, 2009, Appellant left the home he shared with his wife, Sharleetha

_____

[*] Former Justice specially assigned to the Superior Court.

[1] Only the murder conviction is being challenged in this appeal.

Brown. He told Brown that we would return in a few hours. At that time, Appellant and Brown resided in the home with Brown's brother (Clarence Brown) and his romantic partner (Latona Phillips).

After Appellant left that night, Brown called the victim, Lateaf Dumas, asking him to come to the house. Brown and Dumas had been romantic partners the previous year, when Appellant was serving a tour of duty in the military. Once Dumas arrived, he and Brown began having consensual intercourse in the upstairs bedroom of the home. Phillips was sitting in the room next to the bedroom that Brown and Dumas had entered.

Appellant returned to the residence earlier than expected, at about 9:40 p.m. He claimed that he heard music playing, as well as the sound of what he believed to be moaning from the upstairs bedroom. He also claimed that he heard Brown say, "stop." N.T. Trial, 2/9/2011, at 68-69; N.T. Trial, 2/10/2011, at 87-88, 122, 130.

Appellant armed himself with a hammer and walked upstairs. When he entered the bedroom, he saw Dumas laying on top of Brown, having sexual intercourse. Appellant quickly struck Dumas in the back of the head with a hammer, and Brown exited the room. *See* N.T. Trial 2/10/2011, at 88, 123.

After striking Dumas several times, Appellant left the bedroom to check on Brown. But as he did so, Appellant saw that Dumas had not gone completely limp. At that point, Appellant picked up a shovel and struck Dumas

in the head with it. At some point during the incident, Appellant also armed himself with a third object, a wrench, using it to strike Dumas.[2]

Appellant ceased the attack upon noticing that Dumas was completely still and making a "snoring, gurgling sound." N.T. Trial 2/10/2011, at 88-89. Forensic evidence showed that Dumas sustained at least 14 blows to the head, resulting in numerous lacerations and fractures of his skull. A medical examiner confirmed that Dumas could not have survived more than a few minutes after the beating had ended. *See* N.T. Trial, 2/9/2011, at 57-58.[3]

Brown initially told Appellant that Dumas had raped her, and that allegation was passed on to the police, who responded to the residence later that evening. The responding officers quickly became skeptical of Brown's story. When they observed the scene, the officers saw that Dumas was on Appellant's bed, laying face-down. Music was playing in the bedroom and candles were lit. The police also noticed that a piece of women's negligee and a condom were on the floor near the bed. *See* N.T. Trial, 2/10/2011, at 17, 21. It therefore appeared to the officers that Brown and Dumas had engaged in consensual intercourse, and that the rape allegation was false.

Appellant was taken to the local police station later that night, and he gave a voluntary statement about what had transpired. He stated that he

---

[2] These tools were evidently on hand because areas of the home had been under construction at the time.

[3] All of Dumas' injuries were inflicted by either the hammer, shovel, or wrench, though it was impossible for examiners to ascertain which tool had caused each injury. *See* N.T. Trial, 2/9/2011, at 30-32, 59.

discovered Dumas in his bed with Brown.  Believing that his wife was being

raped, Appellant claimed that he struck Dumas only to the extent necessary

to neutralize a potential threat:

> It was around 9:40pm. I went in the house, when I got in the doorway I heard music and sounds coming from upstairs. When I closed the door Is till heard music and moaning then I heard my wife, [Brown] say stop. I grabbed the hammer that was at the bottom of the stairs. I ran upstairs to my bedroom. I then opened the bedroom door and found a naked black guy on top of my wife between her legs in my bed. Which appear to me she was being raped. I then swung the hammer and hit the guy on the right side of his head. Then I hit him again and he fell off to the side of my wife. That's when she screamed, then got up and ran out the room as I was still striking the attacker.
>
> The guy fell all the way down on his left side on the bed and I thought he was unconscious. I started to go and check on my wife and as I was about to leave the room, the guy was getting up to get off the bed. I then grabbed the shovel that was right near the doorway of my bedroom. Then I struck the guy with the shovel until he stopped moving and I thought he was no more of a threat. When I left the room the guy was still breathing making a snoring gurgling sound.

N.T. Trial, 2/10/2011, at 87-88.[4]

Appellant was taken into police custody and charged with the offenses

outlined above.  At his trial, the defense's theory was that Appellant lacked

the requisite mental state to commit first-degree murder, as his conduct was

motivated solely by the shock of discovering what he thought to be an ongoing

rape of his wife.

---

[4] Appellant omitted from his statement the fact that he had also used a wrench to kill Dumas.

The prosecution countered that even if Appellant had *begun* attacking Dumas while in a state of shock, an intervening "cooling off" period had given Appellant enough time to form a specific intent to kill. Specifically, Appellant had paused twice while he was striking Dumas, each time arming himself with a different object. The prosecution argued that it had disproven Appellant's defense because each time the attack resumed, he had time to "cool off." Additionally, the blood spatters in the bedroom and other evidence did not support Appellant's assertion that Dumas had attempted to get up from the bed after he had sustained the first few blows from a hammer.

Other evidence put into question whether Appellant was surprised to find Dumas in his home, and whether Appellant really thought his wife was being raped. The scene itself would have appeared to Appellant, as it did to the police, that Brown and Dumas were having consensual intercourse. The prosecution suggested further that Appellant would not have heard his wife having intercourse when he entered the home; nor would he have had a reason to suspect an intruder and to arm himself before going upstairs.

Appellant claimed that he heard Brown say "stop" upon entering his home, but Latona Phillips contradicted that claim, testifying that she never heard Brown say that despite being much closer to the bedroom than Appellant was at the time. *See* N.T. Trial, 2/09/2011, at 74. Brown herself demonstrated the volume she used to tell Dumas to stop, and it was described at trial as "a soft tone of voice." N.T. Trial, 2/10/2011, at 123. Along the

same lines, one of the crime scene investigators, Officer Lamont Fox, testified that the music playing in the upstairs bedroom could not clearly be heard from the first floor, N.T. Trial, 2/10/2011, at 46, contradicting Appellant's claim that he heard the music before he went upstairs with a hammer.

Based on these facts, the prosecution argued that (1) Appellant knew that Dumas was in the home before he returned, (2) Appellant knew what Brown and Dumas were doing, and (3) that the death of Dumas was premeditated. *See* N.T. Trial, 2/11/2011, at 21-22.[5]

At the conclusion of the trial, Appellant was found guilty of first-degree murder and possessing an instrument of crime. The trial court determined that Appellant and Brown were not credible in their accounts of what had transpired, particularly with respect to Appellant's motivations when he repeatedly struck Dumas. *See* N.T. Trial, 2/11/2011, at 36. Significantly, the trial court found that Appellant's story was inconsistent with both the physical and testimonial evidence:

> And I find both your statement and Ms. Brown's testimony to be incredible because I have to look at the objective evidence, and the evidence, the crime scene photos and the medical examiner's photos, don't support either one of your versions. There are nuggets of truth throughout your statement and] throughout her

---

[5] Additionally, Brown had reported to police that Dumas had brought his wallet and phone into her home. However, those items were never found by police when they searched the residence, and Brown testified that she did not know what had happened to them. *See* N.T. Trial, 2/10/2011, at 138-39. In a separate case, Brown was convicted of giving a false report and tampering with evidence. *See id.*, at 139-40.

statement, just not enough nuggets of truth to make me believe either one of you.

I do not believe that you went up the steps having heard your wife and Mr. Dumas. Nothing was changed about that scene. Accordingly, if Officer Fox, who is trained to hear and to observe, didn't hear anything, you didn't either.

I also find given the fact that you live in a house full of people . . . I don't believe you heard anything. Even if you did hear anything, why you assumed it was an intruder since there was no evidence of any break-in, there was no evidence of anything abnormal. You went into that room with that hammer, and the true thing in your statement is that you took that hammer and you hit him one-two, left, right. And that's exactly what the crime scene photos show. You hit him one-two.

Where your statement bothers me the most, Lateaf Dumas never got up off that bed. Because taking your statement to be true, that you hit him one-two, which the photos do substantiate, you hit him one-two and blew out the back of his head. So let's say you didn't kill him and he did get up, where is the blood that would have gone through the room as he got up to approach you? The blood is exactly where it would be when you hit that man as he was laying exactly as I see him in these pictures.

You knew exactly what you were doing. You took that hammer to his head and you blew his brains out with that hammer. The rest of these implements, I can't even process. And the law doesn't require me to process that. Because the objective evidence tells me that you killed Lateaf Dumas as he lay in the position that I see him. And that's why you don't have any blood on you, because if he had got up and come toward you, there should have been evidence of your hitting him face forward. There should have been evidence of you knocking him down and he should have been on his back. But he is on his stomach with his arms up just as they were when Sharleetha Brown was under him. He never got up.

*Id*., at 33-35.

Appellant was then sentenced to a mandatory term of life imprisonment without the possibility of parole. He timely filed a direct appeal, but it was

dismissed due to the failure of Appellant's counsel to file a brief. In 2022, Appellant filed a counseled PCRA petition requesting the reinstatement of his appellate rights. The Commonwealth did not oppose Appellant's request.

On March 10, 2023, Appellant's PCRA petition was granted, and his appellate rights were reinstated, *nunc pro tunc*. Thereafter, Appellant timely filed a notice of appeal and a 1925(b) statement of issues complained of on appeal. In his brief, Appellant now raises two issues for our consideration:

> 1. Is the evidence sufficient, as a matter of law, to convict [A]ppellant of the crime of first-degree murder where the evidence of record does not establish beyond a reasonable doubt that [A]ppellant was not acting under a sudden and intense passion resulting from a serious provocation when he assaulted and killed the decedent?
>
> 2. Is the verdict of guilty on the charge of first-degree murder against the weight of the evidence and so contrary to the evidence that it shocks one's sense of justice under the circumstances of this case?

Appellant's Brief, at 7 (numbering added, suggested answers omitted).

We first address Appellant's arguments relating to the sufficiency of the evidence supporting the convictions for first-degree murder, along with his claim of an unrebutted heat-of-passion defense. As the issue of evidentiary sufficiency involves a question of law, our standard of review is *de novo* and our scope of review is plenary. ***See Commonwealth v. Sanchez***, 36 A.3d 24, 37 (Pa. 2011).

A review of the sufficiency of the evidence requires this Court to determine whether the evidence admitted at trial was sufficient to prove every

element of the offense beyond a reasonable doubt. *See Commonwealth v. Von Evans*, 163 A.3d 980, 983 (Pa. Super. 2017). The evidence, as well as all reasonable inferences drawn therefrom, must be viewed in the light most favorable to the Commonwealth as the verdict winner. *See id*. As such, "the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence." *Commonwealth v. Colon–Plaza*, 136 A.3d 521, 525–526 (Pa. Super. 2016) (quoting *Commonwealth v. Robertson–Dewar*, 829 A.2d 1207, 1211 (Pa. Super. 2003)).

It is within the province of the fact-finder (here the trial court) to assign weight to the evidence in the record. *See Commonwealth v. Tejada*, 107 A.3d 788, 792–793 (Pa. Super. 2015). When doing so, the fact-finder is free to believe all, part, or none of the evidence, *see id*., and circumstantial evidence may be relied upon by the Commonwealth to sustain its burden of proving every element of a crime. *See Commonwealth v. Mucci*, 143 A.3d 399, 409 (Pa. Super. 2016). On review, this Court may not reweigh the evidence or substitute our own judgment for that of the fact-finder. *See Commonwealth v. Rogal*, 120 A.3d 994, 1001 (Pa. Super. 2015).

In the present case, the determinative issue of fact to be resolved by the trial court was whether Appellant had the requisite mental state to commit first-degree murder. The offense is defined as a "willful, deliberate and premeditated killing." 18 Pa.C.S.A. §§ 2501, 2502(a), (d). To sustain a conviction as to this crime, the Commonwealth must prove that: (1) a human

being was unlawfully killed; (2) the accused was responsible for the killing; and (3) the accused acted with malice and a specific intent to kill. **See Commonwealth v. Ballard**, 80 A.3d 380, 390 (Pa. 2013).

A jury may infer the intent to kill "based on the accused's use of a deadly weapon on a vital part of the victim's body." **Sanchez**, 36 A.3d at 37. The victim's head has been recognized as a vital part of the body in this context. **See e.g., Commonwealth v. Johnson**, 42 A.3d 1017, 1026 (Pa. 2012) (fatal wounds were inflicted on vital parts of the victim's body, "such as her head and chest."). A blunt object, such as a hammer, shovel, or wrench, may be considered a deadly weapon when the manner of its use "is calculated or likely to produce death or serious bodily injury." 18 PaC.S.A. § 2301. "[S]pecific intent to kill is gauged at the moment of the killing and may be formed in a split second." **Commonwealth v. Sherwood**, 982 A.2d 483, 494 n.21 (Pa. 2009).

Under the Crimes Code, a person is guilty of the lesser offense of voluntary manslaughter if at the time of the killing the defendant acted under "a sudden and intense passion resulting from serious provocation by . . . the individual killed. 18 Pa.C.S.A. § 2503(a); **see also Commonwealth v. Walker**, 656 A.2d 90, 95 (Pa. 1995). "Heat of passion" includes emotions such as anger, rage, sudden resentment or terror, which renders the mind incapable of reason. **See Commonwealth v. Harris**, 372 A.2d 757, 758-759 (Pa. 1977).

A heat of passion defense is a partial defense that addresses the element of intent. *See Commonwealth v. Hutchinson*, 25 A.3d 277, 314 (Pa. 2011). The defense establishes the commission of voluntary manslaughter, since at the time of the killing, the defendant was acting under a sudden and intense passion resulting from serious provocation by the victim. *See id*.

In order to successfully argue heat of passion, then, "a defendant must prove (1) provocation on the part of the victim, (2) that a reasonable person who was confronted with the provoking events would become 'impassioned to the extent that his mind was incapable of cool reflection,' and (3) that the defendant did not have sufficient cooling off time between the provocation and the killing." *Commonwealth v. Williams*, 176 A.3d 298, 313 (Pa. Super. 2017) (quoting *Commonwealth v. Busanet*, 54 A.3d 35, 55 (Pa. 2012)).

"If any element is missing, the provocation defense fails." *Commonwealth v. Martin*, 5 A.3d 177, 189 (Pa. 2010); *see also Commonwealth v. Sanchez*, 82 A.3d 943, 980 (Pa. 2013) ("If any of these be wanting – if there be provocation without passion, or passion without a sufficient cause of provocation, or there be time to cool, and reason has resumed its sway, the killing will be murder.").

We now turn to the facts at hand. It was undisputed that Appellant struck Dumas in the head at least 14 times with three different objects. The episode began when Appellant came home and went upstairs to his bedroom, where he observed Dumas in bed with Brown. Appellant immediately struck

Dumas in the head with a hammer; Appellant then stopped to check on his wife, who had left the bedroom. *See* N.T. Trial, 2/10/2011, at 88.

Appellant claimed that, "as [he] was about to leave the room," he noticed that Dumas was trying to get off of the bed. *Id*. Appellant then picked up a shovel and resumed his attack with that object. *Id*. At some point during the incident, Appellant put down either the hammer or the shovel so that he could arm himself with a wrench and resume bludgeoning Dumas with it. *See* N.T. Trial, 2/10/2011, at 39-40.

The justification Appellant offered for his extended use of lethal force was undercut by the likelihood that Dumas was incapacitated long before the beating ended. As the trial court noted, Dumas was found laying facedown on the bed, a position which would tend to prove that he had succumbed to the earliest blows which Appellant had inflicted. Dumas had barely budged during the entire time it took for Appellant to deliver over a dozen strikes, using three different weapons.

Moreover, there were several aspects of Appellant's story that cannot be reconciled with the testimony of multiple witnesses. He claimed that he heard music, moaning, and the sound of his wife saying "stop" as he entered his home, prompting him to arm himself with a hammer before going upstairs to confront a potential intruder. Yet, Phillips testified that she never heard Brown say stop, and an investigating officer testified that the music was barely audible from the first floor. *See* N.T. Trial, 2/09/2011, at 74; N.T. Trial,

2/10/2011, at 46. This evidence tended to support the prosecution's theory that Appellant knew what was happening in the bedroom before he returned home on the night in question.

Viewing the record and all reasonable inferences in the light most favorable to the Commonwealth, we find that the evidence of Appellant's specific intent to kill was legally sufficient. The evidence supports the trial court's finding that Dumas was immediately incapacitated after sustaining initial blows to head from a hammer, and that Appellant kept striking him when he could have posed no threat.

The evidence adduced at trial also supported the prosecution's contention that Appellant may not have been surprised at the presence of Dumas in his home. This enabled the fact-finder to determine that Appellant's use of force was premeditated, and not unexpectedly triggered by an extreme provocation, undercutting Appellant's heat-of-passion defense. Thus, Appellant's sufficiency claim has no merit.[6]

_____

[6] Appellant cites two cases for the proposition that the evidence of first-degree murder was insufficient as a matter of law because a heat-of-passion defense had been established – **Commonwealth v. Voytko**, 503 A.2d 20 (Pa. Super. 1986), and **Commonwealth v. McCusker**, 292 A.2d 286 (Pa. 1972). In both cases, the defendant used lethal force upon discovering their spouses being intimate with another. However, those cases are not availing for Appellant because they turned on completely different issues. This Court held in **Voytko** that the trial court erred in denying an instruction on voluntary manslaughter because the jury would have been permitted to find the defendant guilty of that offense. **See** 503 A.2d at 23. It was held in **McCusker** that the trial court erred in excluding psychiatric evidence of the defendant's mental state
*(Footnote Continued Next Page)*

We next address Appellant's alternative claim that the verdict was contrary to the weight of the evidence. He argues that the trial court assigned too much weight to its credibility determinations, and not enough weight to the fact that he attacked Dumas immediately after observing highly provocative circumstances. Appellant also downplays the fact that he alternated between three different weapons, stressing instead that those momentary interruptions in the attack constituted scant evidence of a cooling off period. *See* Appellant's Brief, at 44-51.

"A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict." *Commonwealth v. Rayner*, 153 A.3d 1049, 1054 (Pa. Super. 2016) (quoting *Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000)). A trial court's ruling on a motion for a new trial based on the weight of the evidence is subject to an abuse of discretion standard of review:

> The decision to grant or deny a motion for a new trial based upon a claim that the verdict is against the weight of the evidence is within the sound discretion of the trial court. Thus, "the function of an appellate court on appeal is to review the trial court's exercise of discretion based upon a review of the record, rather than to consider *de novo* the underlying question of the weight of the evidence." An appellate court may not overturn the trial court's decision unless the trial court "palpably abused its discretion in ruling on the weight claim." Further, in reviewing a

_____

because it would have been relevant to jury's determination as to his heat-of-passion defense. In neither of those cases did a court hold that a fact-finder was bound to accept a heat-of-passion defense, or that once a provocative act was established, a verdict of first-degree murder could not be entered as a matter of law.

challenge to the weight of the evidence, a verdict will be overturned only if it is "so contrary to the evidence as to shock one's sense of justice."

***Commonwealth v. Cash***, 137 A.3d 1262, 1270 (Pa. 2016) (internal citations omitted).

A verdict is against the weight of the evidence where "certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." ***Commonwealth v. Lyons***, 833 A.2d 245, 258 (Pa. Super. 2003) (quoting ***Widmer***, 744 A.2d at 751–752)). "[W]e do not reach the underlying question of whether the verdict was, in fact, against the weight of the evidence . . . . Instead, this Court determines whether the trial court abused its discretion in reaching whatever decision it made on the motion[.]" ***Commonwealth v. Ferguson***, 107 A.3d 206, 213 (Pa. Super. 2015) (citation omitted).

A trial court's determination that a verdict was not against the interest of justice is "[o]ne of the least assailable reasons" for denying a new trial." ***Commonwealth v. Colon–Plaza***, 136 A.3d 521, 529 (Pa. Super. 2016) (quoting ***Commonwealth v. Clay***, 64 A.3d 1049, 1055 (Pa. 2013)).

In the present case, the central issue at trial was whether Appelland had a specific intent to kill, or whether he acted in the heat of passion when he bludgeoned Dumas to death. The evidence showed that Dumas was struck in head at least 14 times while he was laying naked, face-down on a bed. Appellant twice paused to arm himself with a different object to use as a

weapon. The trial court found his statement about how the incident unfolded not to be credible; Appellant's wife, Brown, was also found not to be credible.

On these facts, we cannot find that the trial court abused its discretion in denying a new trial. The trial court determined that Appellant and Brown lied about the circumstances in which her infidelity was discovered, and there is no basis for this Court to disturb that finding. As to Appellant's mental state, the trial court referred to the physical evidence and testimony of several witnesses which refuted Appellant's story. Again, this Court has no basis to question the manner in which the trial court assigned weight to that critical, conflicting evidence. As the verdict was not so contrary to the evidence as to shock one's sense of justice, the order on review must be upheld.

Judgment of sentence affirmed.

President Judge Emeritus Stevens joins the memorandum.

Judge Lane did not participate in the consideration or decision of this case.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/1/2024